RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0276p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 11-1798

MARCUS LAMONT FREEMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:06-cr-20185-2—Victoria A. Roberts, District Judge.

Argued: June 13, 2013

Decided and Filed: September 13, 2013

Before: COLE and COOK, Circuit Judges; KATZ, District Judge.[*]

_____

### COUNSEL
_____

**ARGUED:** Craig A. Daly, Detroit, Michigan, for Appellant. Patricia Gaedeke, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Craig A. Daly, Detroit, Michigan, for Appellant. Elizabeth A. Stafford, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

### OPINION
_____

COLE, Circuit Judge. Defendant-Appellant Marcus Freeman was convicted by a jury in the United States District Court for the Eastern District of Michigan of conspiracy to use interstate commerce facilities in the commission of murder for hire, 18 U.S.C. § 1958. He received a sentence of life without parole. Freeman now brings

_____

[*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

a direct appeal from that conviction, arguing that (1) the district court erred by permitting the Federal Bureau of Investigation agent in charge of the investigation to give lay testimony under Federal Rule of Evidence 701, (2) the district court erred with respect to various other evidentiary rulings, (3) the district court erred by declining to amend the jury instructions according to Freeman's requests, and (4) there was insufficient evidence to sustain Freeman's conviction. For the following reasons, we vacate Freeman's conviction and remand for a new trial.

I.

In November 2005, as part of a separate drug investigation, the FBI began wire intercepts of cellular telephones of several individuals pursuant to Title III of the Wiretap Act, 18 U.S.C. §§ 2510–22, including a phone used by Roy West, Freeman's co-defendant in this case. West was eventually convicted of paying Freeman to murder Leonard Day.

The calls revealed that Day, who was wanted for murder in Detroit, had stolen about $100,000 in cash, $250,000 in jewelry, a gun, and car keys from West while hiding out at West's Ohio home. Immediately after the theft, West began to search for Day. Day's cousin, whose phone was also wiretapped, suggested to West that Day may have gone to the Greyhound bus station near West's home in Akron, Ohio, in order to return to Detroit. West offered to pay $1,000 to whoever went to the bus station to find Day. He suggested that that person take a "heater" because there was "nothing to talk about." The FBI, fearing that Day's life was in danger based on the phone intercepts, similarly searched for Day at the bus station. No one, however, located Day.

West continued to look for Day. The day after the theft, West learned from another of Day's cousins that Day had returned to Detroit. West and other co-defendants gathered bulletproof vests and firearms in preparation for a manhunt of Day. The FBI recorded West telling one co-defendant, Christopher Scott, to "[g]et them pipes ready" and "grab up a whole bunch more things." The FBI believed these were references to firearms.

Once in Detroit, West threatened Day's family, Day's girlfriend, Kanisha Crawford, and Crawford's family members in an attempt to locate Day. On the evening of November 11, 2005, West and his associates spotted Crawford outside a Days Inn in Detroit where Crawford and Day were staying. They tried to approach Crawford, but she escaped into a nearby CVS, and the police were called. West and his associates were arrested, but no charges were filed.

West's search for Day continued with the assistance of Scott and Freeman. Intercepted phone calls revealed that Freeman, who already had a personal relationship with Day's cousins, was "spying" on Day's family in order to determine Day's location. At one point, West paid members of Day's family to recover some of his jewelry. Freeman refused to convey this money to the family himself, afraid that the Day family would recognize his connection to West: "But how you gonna get it through . . . then you gonna blow our cover?"

Freeman began to close in on Day. In one call with West, Freeman commented, "This shit should be any day now though fam for real. So I'm on it for sure 'cause I need that." On December 17, 2005, Freeman called West asking for a cross street for a Kilbourne Street address. West did not understand Freeman's question and asked for clarification. Freeman responded, "Dude just called it in, baby, sayin', shit, shit that the truck be in the driveway at night . . . . All the belongings be right in the drawer." Special Agent Peter Lucas, the FBI agent in charge of the investigation, believed that "the truck" was a reference to Day's truck and that Freeman had located Day.

On December 20, 2005, Day was shot while leaving a house at 14759 Kilbourne Street. The FBI checked phone logs for the phone Freeman had been using. For most of the day the phone had made calls from the cellular tower nearest the house where Day was killed. Five minutes after the last phone call, residents started calling 911 to report a shooting at the Kilbourne Street address. Three minutes after the first 911 call, Freeman and Scott called West:

WEST: What up?
FREEMAN: We get rich, Ohio.  We get rich, Ohio.  We get rich, Ohio.
WEST: Who this?
FREEMAN: This is Wood . . .
SCOTT: And Ceaze . . . .
FREEMAN: We be down there to holla' at you in a couple hours Fam.
WEST: What's good?
FREEMAN: Everything good, man.  Except for, you know . . . you know what I'm talkin' about . . . just that one little thing.  We ain't get the bonus, dog.  But, you know what I'm sayin', the situation is over with.
WEST: You bullshittin'.
FREEMAN: Fam, it's over, we get rich baby, you know what I'm talkin' about, but man, we sorry about that other bonus, baby.  But you know, I mean . . . You know.
SCOTT: Fam-O, see you in a minute, man.
WEST: All right.

At trial, Agent Lucas interpreted the phrase "We get rich, Ohio" to mean that Freeman was looking forward to being paid for Day's murder.  When asked what "situation" Freeman was referring to in this phone call, Agent Lucas said, "The situation discussed was regarding Leonard Day and his having stolen jewelry from Roy West, Roy West having put a hit on Leonard Day and Leonard Day ultimately being killed."

After hanging up, West called another co-defendant and stated that "[t]hey say dude up out of here . . . motha' fuckers just called me."  Minutes after that conversation West told his brother that "somebody done murdered that nigger Buck man."  West made other similar phone calls that day.  When speaking with Day's family members, however, he did not mention the murder, instead behaving as if nothing eventful had happened.

According to the prosecution's theory, West, Freeman, and Scott then met to exchange payment for the murder.  By the early morning hours of December 21, 2005, the phone used by Freeman was no longer in Detroit but was instead in Akron, Ohio, using the same cell phone tower as West's phone.  Freeman called West and proposed that they meet at West's house in Akron.  Later that day, Scott called West, asked "Did you count that?" and said "the count" was "fifty-six twenty."  During trial Agent Lucas interpreted this to mean $5,620, in reference to money paid for killing Day, although

before the grand jury he was less sure and testified "[I]t's a multiple of 10.  Either 56, 5,620, 56,000."

Some days later Freeman was jailed after an arrest for an unrelated offense.  Phone calls between Freeman and his girlfriend were recorded while he was incarcerated.  On one call he told her, "Do not fuck that chip up.  Dude name in the phone."  He also told her that "BUC" "still owe me some cheese."  Agent Lucas testified that "BUC" was a reference to West and that Freeman was telling his girlfriend that West still owed him money.

After a jury trial, Freeman was convicted under 18 U.S.C. § 1958 for conspiracy to use interstate commerce facilities in the commission of murder for hire.  On June 20, 2011, the district court imposed a life sentence.  Freeman brought a timely appeal.

II.

Freeman argues that his conviction should be vacated on four separate grounds: (1) the district court improperly permitted Agent Lucas to give lay testimony under Federal Rule of Evidence 701, (2) the district court erred with respect to various other evidentiary rulings, (3) the district court erred by not amending the jury instructions, and (4) there was insufficient evidence to sustain Freeman's conviction.  Because we conclude that the district court erred on the first ground, we grant relief on that basis and decline to reach the remaining issues.

The government's primary evidence against Freeman consisted of 23,000 phone conversations between Freeman, West, Scott, and other co-defendants.  Seventy-seven of these calls were admitted as exhibits at trial, and portions of them were played for the jury.  Agent Lucas was called to testify regarding his personal impressions of the recorded conversations.  Agent Lucas thus interpreted the conversations as they were played.  His testimony ranged from voice and nickname identifications to substantive interpretations of the meaning of the various statements. Defense counsel objected near the beginning of this testimony: "I think this is outside of the scope of both the notice we received regarding this witness's expertise and his expertise.  Both."  While Agent

Lucas had been qualified as an expert to testify to the meaning of specific code words and drug slang, both parties recognized that his testimony had moved outside the scope of his expert qualification. The prosecution responded: "Your honor, this is not expert testimony. This is based upon his personal knowledge of the investigation." The objection was overruled, and Agent Lucas continued to testify as a lay witness under Rule 701. The defense was granted a standing objection to all of Agent Lucas's lay interpretations regarding the phone calls.

Throughout the recordings, Agent Lucas interpreted conversations between Freeman and his co-defendants to broadly illustrate the prosecution's theory of the case for the jury. At the end of one phone call between West and Freeman, for example, in which they discuss "the word on dude," Freeman says, "I told you I was chillin' over dude house." Freeman additionally says, presumably referring to Day's family, "[T]hey was talkin' about the dude, so he definitely phonin' in." Freeman ends the call by stating, "This shit should be any day now though fam for real. So I'm on it for sure 'cause I need that." Agent Lucas testified to the meaning of this call, including Freeman's final statement. Agent Lucas told the jury, "I believe he is referring to the fact that he needs the payment he expects from Roy West if he's successful in locating Leonard Day . . . for the purpose of recovering the jewelry and killing him."

In another call, which occurred three minutes after the first 911 call, immediately after Day's death, Freeman told West that "the situation is over." Agent Lucas was asked about the meaning of "the situation." He testified, "The situation discussed was regarding Leonard Day and his having stolen jewelry from Roy West, Roy West having put a hit on Leonard Day and Leonard Day ultimately being killed." Similar "interpretations" occurred throughout Agent Lucas's testimony.

On appeal, Freeman argues that Agent Lucas's testimony was improper lay testimony under Federal Rule of Evidence 701. "We review for abuse of discretion a district court's evidentiary rulings, including rulings on witness testimony under Rule[] 701 . . . ." *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). "Even when the district court has abused its discretion in admitting evidence, we do not reverse a

conviction if the error is harmless, meaning that it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Lopez-Medina*, 461 F.3d 724, 741 (6th Cir. 2006) (internal quotation marks omitted).

## A.

A witness may testify based on opinion, as opposed to testifying to facts of which he has direct knowledge, under two circumstances: as a lay person under Rule 701 or as an expert under Rule 702. "Such lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *United States v. Jayyousi*, 657 F.3d 1085, 1120 (11th Cir. 2011) (Barkett, J., concurring in part and dissenting in part). To ensure that lay testimony serves "the . . . objective of putting the trier of fact in possession of an accurate reproduction of the event," Rule 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701; *see also id*. advisory committee's note. The burden is on the proponent to provide adequate foundation for the testimony. *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004). If a witness's testimony fails to meet any one of the three foundational requirements, it is not admissible. Fed. R. Evid. 701.

Several of our sister circuits have held testimony inadmissible under circumstances similar to those presented here, *see United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013); *United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010); *United States v. Freeman*, 498 F.3d 893 (9th Cir. 2007); *United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005); *United States v. Peoples*, 250 F.3d 630 (8th Cir. 2001), and four others have held the opposite under different circumstances, *see United States v. Albertelli*, 687 F.3d 439 (1st Cir. 2012); *Jayyousi*, 657 F.3d 1085; *United States v. Rollins*, 544 F.3d

820 (7th Cir. 2008); *United States v. Miranda*, 248 F.3d 434 (5th Cir. 2001). Case law from our circuit, both published and unpublished, has tended to prohibit agents from interpreting phone calls as Agent Lucas did here under Rule 701. *See United States v. Blakeley*, 375 F. App'x 565, 570 (6th Cir. 2010) (finding that an agent's opinion testimony interpreting defendants' conversations was "likely improper" under Rule 701 when the defense argued that the testimony "substituted [the agent's] interpretation of the conversations for the jury's interpretation"); *White*, 492 F.3d at 401–02 (citing approvingly to two Second Circuit cases that excluded agent testimony interpreting wiretapped conversations under Rule 701); *United States v. Ganier*, 468 F.3d 920, 926 (6th Cir. 2006) (citing approvingly to an Eighth Circuit case that excluded agent testimony interpreting wiretaps under Rule 701).

We conclude that here the prosecution did not establish a proper foundation for Agent Lucas's testimony under Rule 701. As several circuits have recognized, there is a risk when an agent "provides interpretations of recorded conversations based on his knowledge of the entire investigation . . . that he [is] testifying based upon information not before the jury, including hearsay, or at the least, that the jury [c]ould think he ha[s] knowledge beyond what [is] before them . . . ." *Hampton*, 718 F.3d at 982–83 (quoting *Grinage*, 390 F.3d at 750, and citing citing *United States v. Dukagjini,* 326 F.3d 45, 53–55 (2d Cir. 2003)) (internal quotation marks omitted); *see also Albertelli*, 687 F.3d at 447 (recognizing that an agent's "testimony may effectively smuggle in inadmissible evidence," that he may be "drawing inferences that counsel could do but with . . . the imprimatur of testifying as a law enforcement officer," that he may "usurp the jury's function," and that he may be "doing nothing more than speculating").

Over the course of his testimony, Agent Lucas repeatedly substantiated his responses and inferences with generic information and references to the investigation as a whole. For example, he made statements such as "We learned over our wiretaps" and "We were able to determine that from some the intercepted calls . . . ." He never specified *personal* experiences that led him to obtain his information but, instead, repeatedly relied on the general knowledge of the FBI and the investigation as a whole.

While the jury, left in the dark regarding the source of Agent Lucas's information, likely gave him the benefit of the doubt in this situation, "the fair inference is that he was expressing an opinion informed by all the evidence gleaned by various agents in the course of the investigation and not limiting himself to his own personal perceptions." *Garcia*, 413 F.3d at 213.  In short, Agent Lucas was called by the government to testify to the meaning of numerous phone conversations irrespective of whether his testimony, at points, was mere speculation or relied on hearsay evidence.  *See Freeman*, 498 F.3d at 903, 904.  Indeed, at oral argument, the government conceded that Agent Lucas lacked the first-hand knowledge required to lay a sufficient foundation for his testimony under Rule 701(a).  *See* Fed. R. Evid. 701(a) advisory committee's note.

Although Agent Lucas did not testify to being present for the surveillance, or even to observing any activity relevant to interpreting the calls, the jury was left to trust that he had some information—information unknown to them—that made him better situated to interpret the words used in the calls than they were.  *See Johnson*, 617 F.3d at 293 ("Agent Smith did not testify to directly observing the surveillance" and thus was not qualified to testify under Rule 701); *see also Jayyousi*, 657 F.3d at 1122 (Barkett, J., concurring in part and dissenting in part) ("But Agent Kavanaugh never explained what knowledge or perception he gained during the investigation that allowed him to interpret the conversations any better than the jury.").  There were approximately 23,000 recorded calls, but only a small number were admitted as exhibits at trial.  When Agent Lucas interpreted those conversations on the basis of his listening to "all of the calls," the jury had no way of verifying his inferences or of independently assessing the logical steps he had taken.  *See Hampton*, 718 F.3d at 983.  Agent Lucas failed to explain the basis of his interpretations—what experience he had that the jurors themselves did not have—and therefore failed to lay a foundation under Rule 701.  *See Albertelli*, 687 F.3d at 450 ("[T]he witness should be prepared to explain the basis for any challenged interpretation and may not say only that it is based on 'the totality of the investigation.'"); *see also Jayyousi*, 657 F.3d at 1120 (Barkett, J., concurring in part and dissenting in part) ("Such lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing

upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.").

Furthermore, a lay opinion should not waste time, "merely tell the jury what result to reach," or be "phrased in terms of inadequately explored legal criteria." *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988) (quoting Fed. R. Evid. 704 advisory committee's note (1972 Proposed Rules)) (citation omitted); *see also* Fed. R. Evid. 701(b). A witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own. *McGowan*, 863 F.2d at 1272 ("[The witness's] proffered testimony . . . consisted of opinions which were not helpful to the jury because they addressed matters that were equally within the competence of the jurors to understand and decide, and thus were inadmissible under Fed. R. Evid. 701 and 702."). Agent Lucas's testimony falls into these very traps. His testimony consisted of many opinions and conclusions the jury was well equipped to draw on their own. He effectively spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language. *See Peoples*, 250 F.3d at 640 (finding that the agent's "testimony was not limited to coded, oblique language, but included plain English words and phrases," and was therefore inadmissible under Rule 701); *Freeman*, 498 F.3d at 905 (holding that the district court abused its discretion in admitting an agent's testimony interpreting phone calls because some of the agent's testimony consisted of "speculation or repetition of already clear statements").

Take, for example, Agent Lucas's testimony as to the phone call between Freeman, Scott, and West three minutes after the first 911 call after Day had been shot:

> WEST: What's good?
>
> FREEMAN: Everything good, man. Except for, you know . . . you know what I'm talkin' about . . . just that one little thing. We ain't get the bonus, dog. But, you know what I'm sayin', the situation is over with.

When asked what "situation" Freeman had referred to, Agent Lucas testified, "The situation discussed was regarding Leonard Day and his having stolen jewelry from Roy West, Roy West having put a hit on Leonard Day and Leonard Day ultimately being

killed." Somehow, when passed through Agent Lucas's interpretive lens, this cryptic exchange becomes crystal clear, and his explanation fits perfectly with the prosecution's view of the case. *See Hampton*, 718 F.3d at 985 (Brown, J., concurring). That is not to say a juror could not have reached the same conclusions as Agent Lucas. It is rather to say that it is not for an agent to divine what vague, plain English language means as Agent Lucas did repeatedly here. *See id.* These types of conclusions are the province of a jury. *See id.*

The government argues that it was helpful for the jury to hear the testimony of an individual who had the opportunity to listen to all 23,000 phone calls since it would have been impractical for the jury to listen to all of the calls themselves. Were this argument "to be accepted, there would be no need for the trial jury to review personally any evidence at all. The jurors could be 'helped' by a summary witness for the Government, who could not only tell them what was in the evidence but tell them what inferences to draw from it." *Grinage*, 390 F.3d at 750. Agent Lucas drew conclusions from the phone calls the jury heard as well as from thousands of other phone calls and FBI evidence the jury had no access to. In doing so, he infringed upon the role of the jury to decide what to infer from the evidence, and instead told them what conclusions and inferences to draw based on his "fifteen years of experience." *Id.*

We can distinguish this case from out-of-circuit cases cited by the government. In those cases, the phone calls included cryptic language, and the testifier explained what personal knowledge he used in interpreting that language. For example, in the Seventh Circuit case, an agent testified based on thousands of calls that coconspirators devised code as they went along, using words with different meanings at different times. *Rollins*, 544 F.3d at 832. That agent opined about the meaning of otherwise nonsensical conversations involving, for example, "having drinks," the height of a "singer" in a "band," and "big shoes and little shoes." *Id.* at 831. Here, however, Agent Lucas testified about not only code words but also common words used in common ways.

Moreover, we emphasize our concern that the jury may have been unduly persuaded by Agent Lucas's position as an FBI agent. An agent qualified as an expert

may interpret coded drug language, as Agent Lucas did.  And a lay witness who has personal knowledge of a particular drug or crime conspiracy may similarly testify to the meaning of coded language within his knowledge.  But a case agent testifying as a lay witness may not explain to a jury what inferences to draw from recorded conversations involving ordinary language.  *Hampton*, 718 F.3d at 985.  At that point, his testimony is no longer evidence but becomes argument.  *See id.*  Agent Lucas effectively told the jury that they were not as qualified as he to interpret the phone calls:

> Q:  You're just an everyday mope like everybody else, right?
> A:  In some respects, yes.  But an everyday mope who has listened to approximately 23,000 Title III calls in this case.
> Q:  Right.  But the Jury could listen to 23,000 phone calls . . . and reach a different personal conclusion, correct?
> A:  That's possible and it would not be based on 15 years of experience in the FBI.

Comments such as these "can convey the impression that evidence not presented to the jury, but known to the [prosecution], supports the charges against the defendant and thus jeopardize the defendant's right to be tired solely on the basis of the evidence presented to the jury."  *Id.* at 983 (quoting *United States v. Young*, 470 U.S. 1, 18 (1985)) (internal quotation marks omitted).  In such cases, the agent may receive unmerited credibility for his testimony when the jury suspects that he has investigative information they do not.  *See Freeman*, 498 F.3d at 903.  An agent presented to a jury with an aura of expertise and authority increases the risk that the jury will be swayed improperly by the agent's testimony, rather than rely on its own interpretation of the evidence.  *See Grinage*, 390 F.3d at 751.  We find enforcement of Rule 701's criteria uniquely important under these circumstances.  *See Hampton*, 718 F.3d at 981–82 (citing *Grinage*, 390 F.3d at 750) ("Judicial scrutiny of a law-enforcement witness's purported basis for lay opinion is especially important because of the risk that the jury will defer to the officer's superior knowledge of the case and past experiences with similar crimes.").

B.

Our conclusion that the district court abused its discretion by allowing Agent Lucas to testify as a lay witness does not automatically lead to reversal. "Even when the district court has abused its discretion in admitting evidence, we do not reverse a conviction if the error is harmless, meaning that it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Lopez-Medina*, 461 F.3d at 741 (internal quotation marks omitted).

The government cursorily argues that, even if the district court abused its discretion by admitting Agent Lucas's testimony under Rule 701, the error was harmless because Agent Lucas could have been qualified as an expert under Rule 702 for the entire scope of his testimony.[1]  The government acknowledges that Agent Lucas's testimony exceeded the scope of its expert notice, *see* Fed. R. Crim. P. 16, but argues that "[c]ourts have found harmless error when a witness was unquestionably qualified to render expert testimony, even in the absence of . . . expert notices." *See United States v. Oriedo*, 498 F.3d 593, 602–03 (7th Cir. 2007); *United States v. Mendoza*, 244 F.3d 1037, 1046–47 (9th Cir. 2001).  Because it is not clear that Agent Lucas would have been qualified as an expert even had the proper notice been given, we cannot say "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Lopez-Medina*, 461 F.3d at 741 (internal quotation marks omitted); *see Johnson*, 617 F.3d at 294 (holding that the error was not "harmless" because the court could not "say with any 'fair assurance' that Agent Smith's testimony would have been admitted as expert testimony").  We therefore reject this argument.

An expert may testify under Rule 702 if his

(a) scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) . . . testimony is based on sufficient facts or data; (c) . . . testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] The government does not argue that it was harmless error to admit Agent Lucas's testimony on the grounds that there was sufficient evidence of guilt independent of Agent Lucas's testimony.

Fed. R. Evid. 702.  A district court must apply Rule 702 to determine whether or not to qualify a witness as an expert.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).  Even if the government had produced an expert notice, it is far from obvious that Agent Lucas could have met the Rule 702 expert testimony requirements.

The requirement that an opinion be "helpful to the jury" is the same under Rule 702(a) as under Rule 701(b).  *See McGowan*, 863 F.2d 1272–73.  For the same reasons that many of Agent Lucas's opinions were not helpful to the jury as lay testimony under Rule 701(b), and therefore inadmissible, his opinions would not have been helpful as expert testimony under Rule 702(a).

Additionally, although Agent Lucas explicitly referred to his expertise and credentials, giving himself an aura of authority on the stand, it is not clear what expert methodology he relied on to form his opinions (outside of his expertise on street slang and drug terms, which had already been granted).  Testimony under Rule 702 must be "the product of reliable principles and methods . . . reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.  Here, Agent Lucas "provided virtually no methodology or guiding principles that would enable him to decode the wiretapped phone calls . . . ."  *Johnson*, 617 F.3d at 294.

We afford the district court "broad latitude" in executing its "gatekeeping" role of certifying experts under Rule 702.  *See Kumho Tire Co.*, 526 U.S. at 152–53.  At trial, the government offered this testimony not under Rule 702, but as lay testimony.  The district court admitted it as such.  It is therefore unclear that the district court would have (or could have) allowed Agent Lucas to give his full testimony as an expert.

Because it does not "appear[] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," *Lopez-Medina*, 461 F.3d at 741 (internal quotation marks omitted), we vacate the conviction.

III.

For the foregoing reasons, we vacate the conviction and remand for a new trial.