**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0380n.06

**FILED**
May 27, 2015
DEBORAH S. HUNT, Clerk

Case Nos. 13-5872/13-6361

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| PATRICK SMITH and TRAVIS GENTRY, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**BEFORE: GRIFFIN and STRANCH, Circuit Judges; and STEEH Senior District Judge.**[*]

**GEORGE CARAM STEEH, Senior District Judge.** The two cases consolidated in this appeal involve a drug operation in which cocaine, cocaine base and marijuana were distributed in Pulaski, Tennessee and the surrounding area. Defendants Patrick Smith and Travis Gentry were charged with conspiracy to violate the federal drug laws, conspiracy to commit money laundering and other related offenses. This appeal followed their convictions and sentences. We **AFFIRM**.

## I. BACKGROUND

In late 2009, authorities began investigating Travis Gentry's involvement in the sale of cocaine in Pulaski, Tennessee. A confidential informant, Josh Harvey, was used to participate in

---

[*] The Honorable George Caram Steeh, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

three controlled buys of cocaine from Gentry. Harvey was given marked currency, and he was wired for audio and video. In addition, Amber Stack, who had a relationship with Gentry, became a confidential informant around the same time. Stack communicated regularly with authorities, providing them "detailed information about the drug trafficking dealings of . . . Gentry and his family organization and some of his co-conspirators that he was involved with."

Based on the information obtained through the confidential informants, a joint task force was created comprised of local and federal authorities. The joint task force obtained court authorization to set up video surveillance and began a wiretap investigation. By the end of the investigation, approximately 43,000 phone calls were intercepted. The joint task force learned the details of Gentry's family-run drug operation dating back to early 2007. Gentry was at the center of the operation. He obtained large amounts of cocaine, cocaine base and marijuana from multiple suppliers to distribute in Pulaski and the surrounding area. Co-defendant Patrick Smith obtained cocaine for Gentry and cooked large amounts of powder cocaine into crack cocaine with him. Gentry's half-brother, Frank Randolph, a/k/a "Tubbs," secreted Gentry's drug proceeds.[1] Multiple other individuals—family and non-family—played a role in the drug distribution operation.

After receiving cocaine or marijuana from one of his suppliers, Gentry cooked some of the powder cocaine into crack cocaine. He sold the entirety of the drugs, some of the cocaine in powder form, and some as crack cocaine. Oftentimes Gentry was fronted the drugs from a particular supplier, and after cooking and selling the cocaine, Gentry paid for the drugs, using the profits to obtain more drugs. Likewise, when he sold the drugs, Gentry fronted the drugs to his customers and accepted payment after the drugs were sold.

---

[1] Frank Randolph's challenges to his convictions and sentence will be addressed separately in *United States v. Frank Randolph*, No. 13-5477. Randolph, Gentry and Smith were jointly tried.

Gentry took multiple actions to further the success of his drug business. He carried a handgun, kept multiple firearms at the different locations where he stayed and in vehicles, and had secret compartments built into multiple vehicles that he drove. The testimony at trial revealed that this was done to protect himself from being robbed, to scare people from cooperating with authorities, and to ensure that he was not caught with drugs.

In one particular incident during the course of the investigation, on January 30, 2011, the joint task force learned that Gentry had met a cocaine supplier. Local authorities initiated a traffic stop of Gentry's vehicle. A search of the vehicle revealed two vacuum-sealed bags of cocaine in a hidden compartment. A total of 249 grams of cocaine and $400 in cash were seized.

The investigation continued until March 17, 2011, when the task force conducted a series of raids completing the investigation. Defendants, among others, were arrested. Several co-conspirators' residences were also raided. The coordinated raids revealed large amounts of cocaine, marijuana, firearms and drug paraphernalia.

Smith and Gentry, along with three others, were charged in a Second Superceding Indictment with: conspiring to knowingly and intentionally distribute and possess with the intent to distribute cocaine, crack cocaine and marijuana (Count One); and conspiring to commit promotion and concealment money laundering (Count Two). Gentry was also charged with knowingly possessing firearms in furtherance of a drug trafficking crime (Count Three); knowing and intentional distribution of cocaine (Counts Six through Nine); and being a felon in possession of a firearm (Count Eleven).

Smith, Gentry and Frank Randolph went to trial together in October 2012. Prior to trial, Smith filed a motion in limine seeking to preclude Agent Darryl Richardson from interpreting wiretap recordings from the investigation at trial as a lay witness under Rule 701 of the Federal

Rules of Evidence.  The district court denied the motion and, at trial, Agent Richardson interpreted dozens of wiretap recordings in the jury's presence.

Defendants were convicted as charged.  After grouping the convictions to arrive at a Guideline range, the district court sentenced Gentry to 30 years' imprisonment.  Smith was sentenced to mandatory life imprisonment because of four prior felony drug convictions enhancing his sentence.

Defendants timely appeal their convictions and sentences.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Defendants challenge the sufficiency of the evidence supporting their convictions.[2]  We review defendants' sufficiency of the evidence claims de novo.  *United States v. Geisen*, 612 F.3d 471, 488 (6th Cir. 2010) (citations omitted).  "[W]e must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012) (citation omitted).  "All conflicts in the testimony are resolved in favor of the government, and every reasonable inference is drawn in its favor."  *Geisen*, 612 F.3d at 488 (citation omitted).

### 1. Count One drug trafficking conspiracy

Sufficient evidence exists to support defendants' Count One convictions.  To sustain a conviction for conspiracy under 21 U.S.C. § 846, "the government must have proved (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841(a)(1); (2) knowledge and intent to join

---

[2] By failing to address the other counts, Gentry preserved his sufficiency of the evidence claim as it relates to Count One, only.  *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted).

the conspiracy; and (3) participation in the conspiracy." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (citing *United States v. Welch*, 97 F.3d 142, 148–49 (6th Cir. 1996)).

Here, the evidence at trial, when viewed in a light most favorable to the government and drawing all reasonable inferences in its favor, supports the defendants' Count One convictions. Overwhelming evidence at trial established that Gentry obtained large quantities of cocaine and marijuana from multiple suppliers, and Smith obtained cocaine to cook with Gentry. This evidence rebuts defendants' argument that a drug conspiracy did not exist, as "[w]e have . . . noted that large quantities of drugs, such as a kilogram or more, support an inference of a conspiracy." *United States v. Lopez-Medina*, 461 F.3d 724, 748 (6th Cir. 2006). In addition to obtaining large quantities of drugs, Gentry and Smith regularly cooked powder cocaine into crack cocaine in amounts that the jury reasonably could have inferred were for distribution. Cooking crack cocaine for distribution also provides evidence of the specific intent to participate in a conspiracy to distribute drugs. *United States v. Brown*, 332 F.3d 363, 372 (6th Cir. 2003). Finally, the jury also heard testimony that Gentry took proactive steps to ensure the continued success of the conspiracy. He used firearms to protect his money and drug supply and to scare people from "snitching," and he had secret compartments built into multiple vehicles that he drove. *See United States v. Wheaton*, 517 F.3d 350, 364 (6th Cir. 2008) (explaining that firearms associated with defendant relevant to show intent to participate in conspiracy).

Contrary to defendants' position, the trial proof established more than a mere buyer-seller relationship. Gentry oftentimes fronted drugs to others, who agreed with Gentry to purchase the drugs for a certain price. These buyers then resold the drugs for profit, obtaining more drugs from Gentry with the profit. The "trust involved in 'fronting' drugs to a buyer before payment is complete may demonstrate more than a mere buyer-seller relationship[.]" *Lopez-Medina*, 461 F.3d

at 747 (citation omitted). Moreover, based on the large amounts of drugs involved in the conspiracy, as explained above, it was reasonable for the jury to determine that there was one overarching conspiracy. *Brown*, 332 F.3d at 373. Viewing the evidence in a light most favorable to the government, defendants' Count One convictions are supported by sufficient evidence.

### 2. Count Two money laundering conspiracy

We turn our attention to Smith's argument that insufficient evidence supports his Count Two conviction. Finding otherwise, we affirm Smith's conviction.

A money laundering conspiracy under 18 U.S.C. § 1956(h) requires "the government [to] prove that the defendant 'agreed with another person to violate the substantive provisions of the money-laundering statute. . . .'" *United States v. Faulkenberry*, 614 F.3d 573, 588 (6th Cir. 2010) (citing *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006)). Here, the government alleged promotional and concealment money laundering, which can be charged as alternative bases to support a conviction. *United States v. Martin*, 516 F. App'x 433, 446 (6th Cir. 2013). Viewing the evidence in a light most favorable to the government, a rational trier of fact could find the essential elements of conspiracy to commit promotional money laundering beyond a reasonable doubt.

"Promotional money laundering 'involves the reinvestment of proceeds of unlawful activity into the illegal scheme from which the proceeds were derived.'" *United States v. Jordan*, 511 F. App'x 554, 566 (6th Cir. 2013) (citation omitted). Promotional money laundering occurs where a person uses proceeds of earlier drug sales to buy more drugs to sell. *Id.*

Here, the jury was presented with more than sufficient evidence to conclude that Smith engaged in promotional money laundering. The jury heard wiretap recordings in which Smith obtained large amounts of powder cocaine and cooked it into crack cocaine with Gentry. Based on this evidence, the jury reasonably could have inferred that the monies used to obtain more drugs

6

came from selling drugs in the past. In other words, there was enough circumstantial evidence for the jury to conclude that the money used in Smith's purchases of cocaine represented the profits of unlawful activity. *See United States v. Skinner*, 690 F.3d 772, 782 (6th Cir. 2012) (finding evidence sufficient to support a money laundering conspiracy charge because the defendant "knowingly and routinely transported drug proceeds in furtherance of the drug-trafficking conspiracy, and he was aware that he was paying [for the drugs] with [a co-conspirator's] drug money in order to obtain more drugs to transport to Tennessee."). We affirm Smith's conviction.

## B. Variance

Next, defendants argue that a fatal variance in the trial proof from the Second Superceding Indictment requires reversal of the Count One drug trafficking conspiracy convictions. We disagree.

"A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006). "Ordinarily, this court reviews de novo the question of whether a variance has occurred." *United States v. Adams*, 722 F.3d 788, 805 (6th Cir. 2013) (citation omitted). Reversal is required where "(1) a variance occurred and (2) that variance affected the defendant's substantial rights." *Id.* (citing *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008)). In the context of a conspiracy, "'a variance constitutes reversible error only if . . . the indictment alleged one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies.'" *Id.* at 805–06 (citation omitted). Here, however, we review defendants' claim for plain error because it is being raised for the first time on appeal. *Id.* at 805 (citation omitted). "Under this standard, the second part of our inquiry 'requires [defendants] to prove that the error affected the outcome of the district court proceedings.'" *Id.* (footnote and citation omitted).

7

We do not believe that defendants have established a variance. There is sufficient evidence, viewed in a light most favorable to the government, showing one large conspiracy. Defendants, in addition to multiple other co-conspirators, shared a common goal of obtaining money by distributing cocaine, crack cocaine and marijuana in Pulaski and the surrounding area. The jury was free to reject the view that multiple smaller conspiracies existed.

### C. Agent Richardson's Testimony Under Fed. R. Evid. 701

We turn our attention next to Smith's argument that the district court erred in allowing Agent Richardson to interpret at trial, as a lay witness under Rule 701 of the Federal Rules of Evidence, ordinary English, non-technical words from the wiretap recordings. Rule 701 permits opinion testimony that is "(a) rationally based on the witness's perception"; "(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and "(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." We discern no error with the district court's decision allowing Agent Richardson to testify under Rule 701.

Generally, we review claims of evidentiary error for an abuse of discretion. *United States v. Mayberry*, 540 F.3d 506, 515 (6th Cir. 2008). Under this standard, "[w]here an error is not of constitutional dimension, it is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990) (citation omitted). However, plain-error review applies where there is no objection at trial, requiring the defendant to show "(1) error, (2) that 'was obvious or clear,' (3) that 'affected the defendant's substantial rights,' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Warman*, 578 F.3d 320, 345 (6th Cir. 2009) (citations omitted). Under either standard, Agent Richardson's testimony was permissible.

Smith points to three specific wiretap recordings he claims Agent Richardson should not have been permitted to interpret at trial.[3] First, Agent Richardson testified that, in a September 6, 2010 phone call between Smith and Gentry, Smith's statement that "[I'm] going to try to do like . . . three this time, I'm going to have them throw me another one in there," meant that Smith was obtaining three ounces of cocaine instead of two. Second, Agent Richardson testified about an August 26, 2010 phone call between Smith and Gentry in which Smith referenced "holler[ing] at a little brother" and "grabb[ing] a couple of them." Agent Richardson testified that "little brother" was a reference to Smith's cocaine supplier. Finally, Smith challenges Agent Richardson's interpretation of a series of phone calls between Smith and Gentry on January 27, 2011. On that date, the joint task force learned that Smith was obtaining three ounces of cocaine from Gentry. However, Gentry suspected law enforcement in the parking lot and did not give Smith any cocaine. Subsequently, Smith was stopped by police. He called Gentry in a series of phone calls after the traffic stop, stating, "you saved me." At trial, Agent Richardson testified that "you saved me" meant that Gentry saved Smith by not allowing him to leave with cocaine that night.

Smith relies solely on *United States v. Freeman* in arguing that Agent Richardson's testimony was impermissible and requires a new trial. 730 F.3d 590 (6th Cir. 2013). *Freeman* is distinguishable. In *Freeman*, defendant Marcus Freeman was convicted of conspiring to use interstate commerce facilities in the commission of murder for hire, in violation of 18 U.S.C. § 1958. 730 F.3d at 592. The government, through a wiretap drug investigation, learned that Freeman participated in a murder-for-hire plot. At trial, an agent who was involved in the drug investigation

---

[3] To the extent Smith challenges additional interpretations made by Agent Richardson at trial, he has waived appellate review. It is not the court's duty to parse through hundreds of wiretap conversations played at trial to determine which interpretations by Agent Richardson were permissible. Smith points to only three contested interpretations.

9

testified to certain intercepted phone calls involving Freeman and others, in which the agent interpreted as plotting the murder. *Id.* at 592–94. For example, the agent testified that a statement by Freeman to a co-conspirator, "We get rich, Ohio," meant that Freeman had committed the murder. *Id.* at 593. From jail on an unrelated offense, Freeman called his girlfriend and stated, "Do not fuck that chip up. Dude name in the phone." *Id.* The agent testified that Freeman meant that his co-defendant still owed him money for the murder. *Id.* Seventy-seven phone calls were admitted as exhibits at trial, and the agent testified regarding his personal impressions of the conversations, which "ranged from voice and nickname identifications to substantive interpretations of the meaning of the various statements." *Id.*

Freeman was convicted of using interstate commerce facilities in the commission of murder for hire. *Id.* He challenged his conviction arguing, *inter alia*, that the district court improperly permitted the agent to give lay testimony under Rule 701. *Id.* We held that the agent's testimony was improper under Rule 701. First, we reasoned that the agent was testifying based on his knowledge of the entire investigation as opposed to personal experiences that led him to interpret the specific wiretap recordings played at trial. *Id.* at 596. Second, we explained that the agent's testimony "consisted of many opinions and conclusions the jury was well equipped to draw on their own." *Id.* at 597. We stated that "it is not for an agent to divine what vague, plain English language means as [the agent] did repeatedly here. These types of conclusions are the province of a jury." *Id.* at 598 (internal citations omitted). However, we distinguished the situation in *Freeman* from situations where "the phone calls included cryptic language, and the testifier explained what personal knowledge he used in interpreting that language." *Id.* at 598.

Here, unlike the agent in *Freeman*, Agent Richardson interpreted the conversations based on personal knowledge as opposed to his general involvement in the investigation. Agent

Richardson was familiar, based on his personal involvement in the investigation and listening to multiple wiretap recordings, with the defendants' voices and their drug lingo. He explained to the jury how he reached each interpretation based on that personal involvement in every step of the investigation. Indeed, Agent Richardson explained that he came to learn of specific code words defendants used to reference drugs and drug related activity. *See United States v. Dugalic*, 489 F. App'x 10, 16 (6th Cir. 2012) ("This court has repeatedly recognized that, in drug cases, officers can testify as to the meaning of code words.") (citations omitted). Although a word, in isolation, may not have a technical meaning, where an agent establishes his basis for concluding that the word is coded drug language, through personal knowledge, such testimony is permissible under Rule 701.

The conversations interpreted by Agent Richardson are different than the conversations interpreted in *Freeman*. In *Freeman*, the agent made a serendipitous discovery of an alleged murder-for-hire plot while listening to conversations in a related drug trafficking investigation. Had the agent in *Freeman* testified about code words the defendants used when referring to drugs, which was the focus of the investigation, such testimony may have been permissible if the agent, based on personal knowledge, could have testified that defendants used code when referencing drugs.

In addition, unlike *Freeman*, Agent Richardson did not testify based on generic references to the investigation as a whole. Any evidence Agent Richardson referenced to put the phone calls in context was already admitted at trial. Therefore, Agent Richardson did not bootstrap evidence not admitted at trial through generic references to the investigation as a whole.

### D. Use of Prior Convictions to Enhance Sentence

Smith challenges his life sentence arguing that the district court violated his Sixth Amendment rights by enhancing his sentence using prior convictions without allowing the jury to decide the prior convictions beyond a reasonable doubt. During the course of the proceedings, the

11

government filed an information pursuant to 21 U.S.C. § 851 alleging that Smith had four prior felony drug convictions, resulting in an enhanced statutory mandatory minimum sentence of life imprisonment following Smith's Count One conviction.

"We review *de novo* constitutional challenges to sentences because these challenges present questions of law." *United States v. Layne*, 324 F.3d 464, 471 (6th Cir. 2003) (citations omitted). The Supreme Court in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), held that prior convictions could be used to enhance a defendant's sentence without proving the prior convictions beyond a reasonable doubt at trial. Smith argues that *Almendarez-Torres* is no longer good law. However, we have rejected this argument multiple times. *United States v. Nagy*, 760 F.3d 485, 488–89 (6th Cir. 2014); *United States v. Miller*, 562 F. App'x 272, 311 (6th Cir. 2014); *United States v. Davis*, 591 F. App'x 473, 475 (6th Cir. 2015).

### E. Eighth Amendment Claim

Finally, Smith argues that his mandatory life sentence for a non-violent offense violates the Eighth Amendment's prohibition on cruel and unusual punishment and "evolving standards of decency." Smith is incorrect.

Smith's Eighth Amendment challenge presents a question of law, and, therefore, is reviewed de novo. *Layne*, 324 F.3d at 471. "To determine whether a non-capital sentence falls outside the bounds of the Eighth Amendment's 'evolving standards of decency,' this court is instructed to use what has become known as the 'narrow proportionality principle[.]'" *United States v. Young*, 766 F.3d 621, 625 (6th Cir. 2014) (internal citations omitted). Applying this principle, the punishment for a crime should be "graduated and proportioned to [the] offense," but the proportionality required "forbids only extreme sentences that are grossly disproportionate to the crime." *Id.* (citations and internal quotation marks omitted).

Smith's argument that application of the mandatory minimum sentence enhancement, standing alone, renders his life sentence unconstitutional is foreclosed by our clear precedent. *See, e.g.*, *Nagy*, 760 F.3d at 490 ("[M]andatory minimum sentences are not cruel and unusual."); *Miller*, 562 F. App'x at 312 (upholding mandatory term of life imprisonment without release for career offenders found guilty under 21 U.S.C. § 841).

Nor does Smith's particular situation violate the Eighth Amendment's prohibition on cruel and unusual punishment, as interpreted by our binding precedent. This is not the "exceedingly rare" instance in which we have found a successful Eighth Amendment challenge. *Young*, 766 F.3d at 625. Smith was convicted of two conspiracies: drug trafficking and money laundering. Guns were involved, and Smith's co-conspirators—specifically Gentry—threatened others to prevent them from "snitching." And in Smith's case, it is not simply his convictions here; his "Achilles heel" is his recidivism. *Id.* at 627. In combination with his recidivism, the offenses Smith was convicted of are sufficiently grave. Therefore, we reject Smith's argument that his mandatory minimum sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** defendants' convictions and sentences.