RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0265p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

          *Plaintiff-Appellee,*

    *v.*

No. 14-2247

EMMANUEL GYAMFI,

          *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cr-20055—George C. Steeh, District Judge.

Decided and Filed: October 19, 2015[*]

Before: ROGERS and DONALD, Circuit Judges; ROSE, District Judge.[**]

_____

### COUNSEL

_____

**ON BRIEF:** William W. Swor, Detroit, Michigan, for Appellant. Stephanie M. Gorgon, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

### OPINION

_____

BERNICE BOUIE DONALD, Circuit Judge. In the Detroit Metropolitan Airport, Customs and Border Patrol ("CBP") officers stopped Appellant Emmanuel Gyamfi ("Gyamfi") while he was traveling to Detroit from Ghana. They found at least one kilogram of heroin neatly

_____

[*]This decision was originally issued as an "unpublished decision" filed on October 19, 2015. The court has now designated the opinion as one recommended for full-text publication.

[**]The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

packed in the inner lining of Gyamfi's suitcase, allegedly without his knowledge. Gyamfi was indicted and charged with importing heroin, in violation of 21 U.S.C. § 952(a), and possession with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). At trial, four CBP officers testified that Gyamfi appeared "nervous" while responding to questions about his travel plans and the contents of his suitcase. The jury found Gyamfi guilty, and the district court sentenced Gyamfi to seventy-two months in prison. On appeal, Gyamfi contends that the district court improperly admitted conclusory testimony as to his mental state without laying a proper foundation. We disagree and **AFFIRM** the conviction.

I.

On January 8, 2013, Gyamfi arrived at the Detroit Metropolitan Airport after a long trip from Ghana. When he arrived at the primary customs checkpoint, CBP Officer David Myers asked Gyamfi some basic questions about the purpose of his trip. As Gyamfi attempted to explain his travel itinerary, he began to stutter. Unable to understand Gyamfi's words, Officer Myers directed Gyamfi to the secondary customs checkpoint. There, CBP Officer David Crocker also interrogated Gyamfi about the purpose and details of his trip. Again with a "thick and pronounced" stutter, Gyamfi attempted to explain that he was on his way to visit a cousin in Connecticut, but that he had changed his original departure date because his daughter fell ill when he had initially planned to leave. Appellant's Br. 2. Officer Crocker selected Gyamfi's baggage for inspection and escorted Gyamfi to the baggage control area, where three officers, Dawn Matthews, Seth Russell, and Nathan Evers, interrogated Gyamfi about the suitcase's contents.

After the officers emptied the suitcase of its visible contents, Officer Evers picked up the suitcase and noticed that it still seemed to have something in it. Officer Russell then ran the suitcase through an X-ray machine, which revealed images of an oddly shaped "green blob" inside the suitcase. CBP Supervising Officer Christopher Anaya then joined the investigation. Appellant's Br. 3.

While Officer Evers placed Gyamfi in handcuffs, Officer Russell dismantled the suitcase, cut through its lining, and discovered a wrapped package containing 1.8 kilograms of heroin. Officers Evers and Anaya escorted Gyamfi to a "search room" where Officer Anaya asked

Gyamfi a series of questions about whether he knew about the drugs in his suitcase. Gyamfi denied knowing anything about the contents and later testified at trial that his wife purchased the suitcase secondhand.

At trial, the government introduced testimony from Officers Myers, Crocker, Matthews, Evers, Russell, and Anaya, who all had interacted with Gyamfi on the day of his arrest. Four of the six officers consistently and similarly described Gyamfi as "nervous."

**Government's direct examination of Officer Crocker:**

Q.    And prior to even speaking to him, did you make any observations about him?

A.    He seemed to be a little nervous, and his movements were sort of exaggerated . . . .

Q.    What about the way he presented to you caused you to send him over [to] inspection?

A.    Just the fact that he seemed nervous and fidgety, and also that he had changed his ticket before his travel . . . .

**Government's direct examination of Officer Matthews:**

Q.    Can you describe the defendant's appearance when he initially came to you with the suitcase?

A.    When he was brought over to our area, I noticed he was sweating a lot and he was walking—as he was walking up to us with his head down, and when he place[d] his bags on the belt, I noticed his hands were trembling, and he seemed like he was either upset or nervous . . . .

Q.    And as you were questioning him, can you describe generally his demeanor?

A.    He was still nervous. As I was speaking to him[,] he was still wiping off his face and his brow with the paper towel, and he put it in his hands and moved it back and forth almost like a wringing type of fashion [sic].

Q.    In your experience are people generally nervous at baggage control secondary?

Defense:    Objection. Irrelevant. What other people are is irrelevant.

Court:    Ms. Prasad?

Government:  I'll move on.

Q.      And he's speaking with his language impediment?

A.      Yeah.  He was stammering, kind of like tripping over his own words, and I just figured that was because he was a little nervous . . . .

**Government's direct examination of Officer Evers:**

Q.      When you came in contact with the defendant at the baggage control secondary, describe his demeanor.

A.      He was escorted to us by Officer Crocker, and he appeared very nervous. He was sweating very bad.  He was kind of stumbling when he walked over to us.

Q.      Did he maintain eye contact with you?

Defense:      Objection.  Relevance.  I mean, you know, I have not objected prior, but this really is all kind of—excuse the expression—voodoo testimony.  It is sort of like Cam[u]s' trial where we're talking about whether or not he loved his mother, cried at his mother's funeral.  What he appeared to the officers is irrelevant.

Government:  I strenuously disagree with that, your Honor.  How he appeared and what he said is really relevant to the heart of this case.

Court:      The objection is overruled . . . .

Q.      Officer Evers, did you ask him why he was so nervous?

A.      Yes, I did . . . .

Q.      In fact, at any point did you ask him whose clothes are these?

A.      When I pulled the items out, a lot of the items appeared that they were not going to fit him, and some were female items.  So I remember asking him, because he was so nervous[,] I thought he was going to pass out . . . .

**Government's direct examination of Officer Anaya:**

Q.      Can you describe the defendant's demeanor at this point in the process?

A.      Once we started dismantling the bag, I remember looking over at him.  He dropped his head.  We call it the wind going out of your sails.  It's was [sic] just, you know, like giving up motion [sic], something like that.

Defense:      Objection.  Move to strike all the speculation, the commentary material.  This witness is not been [sic] offered to—offer any kind of opinion.

Government:  Well, your Honor, he was describing what he observed.

Defense:      He went beyond describing with a whole bunch of editorial is what we call it, and things of that nature.

Government:   I can move on.

Court:  All right [sic] . . . .

## II.

Gyamfi makes three arguments on appeal:  (1) that the district court abused its discretion in admitting the CBP officers' testimony because it failed to meet Federal Rule of Evidence 701's foundational requirements; (2) that the district court abused its discretion in admitting the CBP officers' testimony because it made legal conclusions; and (3) that the district court abused its discretion in admitting the CBP officers' testimony because it was irrelevant evidence of Gyamfi's character, which is impermissible under Rule 404.

## A.

The standard of review is in dispute.  The government contends that this Court must review Gyamfi's conviction and sentence for plain error because it contends that Gyamfi failed to preserve his arguments by properly objecting to the contested admissions of officers' testimony.  *See United States v. Bostic*, 371 F.3d 865, 872-73 (6th Cir. 2004) ("If a party does not clearly articulate any objection and the grounds upon which the objection is based, when given this final opportunity to speak, then that party will have forfeited its opportunity to make any objections not previously raised and thus will face plain error review on appeal.")  Although Gyamfi made three objections, we need not determine whether Gyamfi's counsel sufficiently preserved the arguments he now makes on appeal, because Gyamfi's arguments fail whether we apply plain error review or the more demanding abuse of discretion scope of review.

## B.

Gyamfi first argues that the government failed to establish a proper foundation under Rule 701 to admit officers' testimony "describing their perception of Gyamfi's physical demeanor."  Appellant's Br. 4.  Gyamfi contends that describing his appearance as "nervous" was a psychological observation that caused the jury to adopt certain legal conclusions regarding Gyamfi's state of mind—namely, that he knew that his suitcase contained heroin.  What was missing, Gyamfi asserts, was the officers' first-hand knowledge to support their "particular interpretations" of his body language.  Appellant's Br. 19.  To be clear, Gyamfi agrees that the

trial court properly admitted the officers' opinion testimony regarding their objective observations of his physical appearance; rather Gyamfi's arguments on appeal concern the officers' testimony that he was "nervous" during the interrogation. Appellant's Reply Br. 6.

Rule 701 states that testimony in the form of a lay person's opinion may be admitted only if the testimony meets the following requirements: (a) it is rationally based on the witness' perception; (b) it is helpful to clearly understanding the witness' testimony or to determining a fact in issue; and (c) it is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *See id.* advisory committee's notes. The party offering the testimony under Rule 701 must establish that all three requirements are satisfied. *United States v. Freeman*, 730 F.3d 590, 595-96 (6th Cir. 2013) (vacating a conviction due to evidentiary errors concerning a case agent's testimony).

In *Freeman,* we concluded that, in order to satisfy Rule 701(b), an officer describing a particular event must limit testimony to his or her "own sensory and experiential observations." 730 F.3d at 595, 597. Speaking outside of these personal observations can potentially lead to "merely tell[ing] the jury what result to reach" or, worse, spoon-feeding the jury the government's theory by using hearsay or otherwise unreliable conclusory statements. *Id.* at 597 (citation omitted); *see also United States v. Albertelli*, 687 F.3d 439, 447 (1st Cir. 2012) (recognizing the possible dangers with testimony given by an agent, such as "effectively smuggl[ing] in inadmissible evidence," "drawing inferences that counsel could do but with . . . the imprimatur of testifying as a law enforcement officer," "usurp[ing] the jury's function by effectively testifying as to guilt," and speculating). This is particularly unhelpful when a witness, lay or expert, forms conclusions for a jury that the jurors were competent to reach on their own. *Freeman*, 730 F.3d at 597.

We have also held, however, that testimony about the appearance of a person is "a typical example of Rule 701 evidence." *United States v. Kaufman*, 92 F. App'x 253, 256-57 (6th Cir. 2004) (affirming the admission of an officer's testimony describing that the defendant "appeared nervous during his interview"). Additionally, testimony related to a person's manner of conduct is categorized as a prototypical example of Rule 701 evidence. *See Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995).

Gyamfi turns to our decision in *Freeman* for support, arguing that the CBP officers similarly lacked sufficient personal knowledge to testify because they "did not establish what personal experiences or first-hand knowledge led them to reach their interpretations" of Gyamfi's demeanor as "nervous." *See* Appellant's Br. 19. Yet, the facts in *Freeman* are materially different from the facts in this case. In *Freeman*, a defendant appealed his conviction on the ground that the district court erred by permitting a Federal Bureau of Investigation ("FBI") agent to interpret the meaning of statements made during phone calls that the FBI intercepted and played to the jury. *Freeman*, 730 F.3d at 592-94. For instance, the agent interpreted the phrase "We get rich, Ohio" to mean that the defendant was looking forward to being paid for the victim's murder. *Id.* at 593. The agent also interpreted "the count was fifty-six twenty" to mean $5,620, in reference to money paid for killing the victim. *Id.* at 594. The testimony was improper under Rule 701, because the testimony was based on a recorded conversation in which the agent had no personal involvement or first-hand experience. *Id.* at 596-97.

However, unlike the FBI agent in *Freeman*, the CBP officers here had the benefit of physical presence and active participation in the encounters with Gyamfi—that were unique and separate from anything that a juror could observe in court. In fact, the officers merely described their "own sensory and experiential observations," distinct from any broad conclusions or allegations directed to the merits of the case. For instance, the officers' testimony included statements that Gyamfi was "fidgety," that his movements were "exaggerated," that his hands were "trembling," that he was "tripping over his own words," that he was "sweating very bad," and ultimately that he appeared "nervous"—all of which a person observes and understands based on experiences from everyday life. Appellant's Br. 19-20. Therefore, the district court did not abuse its discretion, nor did it commit plain error in finding a sufficient personal knowledge basis for admission of the officers' testimony.

C.

Second, Gyamfi argues that the district court's admission of the officers' testimony describing Gyamfi's "nervousness" was improper because the testimony prevented the jury from reaching its own conclusion. Gyamfi contends that the officers' testimony improperly raised the

inference that Gyamfi knew that he had heroin in his suitcase. Consequently, he argues that the testimony "affected the jury's ability to fairly assess all the facts in evidence" because it "directly contradicted Gyamfi's defense that he neither owned the suitcase" nor knew anything about the heroin contained therein. Appellant's Br. 23. We disagree.

The issue here in some ways overlaps with the one raised regarding the officers' alleged lack of personal knowledge. Gyamfi compares the admission of the CBP officers' testimony to the impermissible admission in *Freeman*, but Gyamfi's "nervousness" recounted by the officers was indeed a perception and not a legal conclusion. Gyamfi again cites a case where this Court found testimony interpreting *recorded* conversations inadmissible. Again, facts involving interpretations of *recorded* encounters are wholly distinct from facts where officers interpreted what they indeed perceived first-hand, in an encounter that cannot be re-played for a juror.

Although "nervousness" describes an emotion, the jury only considered testimony that described any ordinary person's everyday observations from a first-hand account. Describing one as "nervous" is no different from describing one as "sad" or "happy," which are all everyday, ordinary observations. True, had the officers speculated as to *why* Gyamfi appeared "nervous," by expressly suggesting guilt, then, indeed, the testimony may have impermissibly suggested a legal conclusion.

Although one may infer knowledge of heroin possession based on the description of "nervousness," criminal guilt is still far from the only inference one could draw. Alternatively, one could attribute Gyamfi's nervousness to the fact that he is thousands of miles away from home, that he is in a foreign country, or due to apprehension about forgetting something on the plane. In other words, one could reasonably imagine someone looking "nervous" at an airport without having done anything wrong.

Further, Gyamfi argues that describing Gyamfi's gestures as a "giving up motion" was in the form of an impermissible psychological and legal conclusion that a witness is not qualified to make. The description does not establish the mental state of the charged offense—knowledge— but rather the demeanor of Gyamfi. Describing what someone else knows in fact requires expert witness qualifications. The distinction, although admittedly subtle, between lay and expert witness testimony is that lay testimony results from a process of reasoning that is familiar in

everyday life, while expert testimony results from a process of reasoning that can be mastered only by specialists in the field. *United States v. Kilpatrick*, 798 F.3d 365, 385 (6th Cir. 2015). Because a gesture expressing "giving up" is a familiar expression in everyday life, the officers in this case could have reasonably perceived the gesture or motion without having a mastery of a particular specialty.

The description also does not qualify as a legal conclusion. A "giving up" description could have equally described a person in a police interrogation giving up in response to a host of interactions—i.e., giving up out of frustration of being interrogated although innocent of committing any crime. In other words, the officers' testimony did not "flatly conclude[] that Mr. Gyamfi's physical expression indicated a particular mental state," as Gyamfi suggests. Appellant's Br. 24.

## D.

Third, Gyamfi argues that the district court abused its discretion in admitting the CBP officers' testimony because it was improper character evidence under Rule 404. This argument also fails, mostly for reasons already stated.

Rule 404 states that "evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Without citing any case law that would even slightly support the notion that one's "nervousness" can qualify as a character trait, Gyamfi fails to demonstrate that observing an ordinary manifestation of a human emotion that is reactionary in nature could qualify as a character trait. As the government accurately points out, it did not offer the officers' testimony of Gyamfi's "nervousness" to prove that Gyamfi acted "in accordance with [his] character," but to describe his appearance on January 8, 2013. Of course, had the officers testified that Gyamfi appeared to be a "terrorist" or a "thief" or a "drug dealer," then admission of such testimony would have been problematic. This was not the case here.

## III.

For the foregoing reasons, we **AFFIRM** Gyamfi's conviction.