RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0253p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

GENE ALLEN HOWELL,

*Defendant-Appellant.*

No. 20-5858

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:17-cr-10098-1—S. Thomas Anderson, District Judge.

Decided and Filed: November 8, 2021

Before: GUY, MOORE, and GIBBONS, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:** J. Nicholas Bostic, Lansing, Michigan, for Appellant. Matthew J. Wilson, UNITED STATES ATTORNEY'S OFFICE, Jackson, Tennessee, for Appellee.

───────────────

**OPINION**

───────────────

RALPH B. GUY, JR., Circuit Judge. A jury convicted Gene Howell of armed bank robbery, brandishing a firearm during the robbery, a separate attempted armed bank robbery, discharging a firearm during the attempted robbery, and being a felon in possession of a firearm. Howell now argues on appeal that the district court improperly: interfered with his right to testify; allowed the identification testimony of a bank teller; refused to bifurcate the felon-in-possession-of-a-firearm charge that was "vindictively added" sixteen months after the initial

indictment; applied the base offense level for attempted first-degree murder; and imposed a two-level offense enhancement because a victim was "physically restrained."  Finding no reversible error, we AFFIRM.

I.

A.

In 2017, defendant Howell's girlfriend was Janet Nicole Thompson.  She testified for the government at Howell's trial.  Thompson had pleaded guilty to aiding and abetting Howell in the successful robbery of a bank in Finger, Tennessee, on August 25, 2017, and aiding and abetting Howell in the attempted robbery of a bank in Reagan, Tennessee, on October 14, 2017.  Security cameras at each bank recorded the events (without audio), and the video footage was shown to the jury.[1]

*The Finger Bank Robbery*.  Thompson told the jury that in August 2017 she and Howell were unemployed and homeless.  They were staying with friends, in hotels, or in their car.  The day before the Finger bank robbery, Howell hid food in the woods, and took Thompson to a stolen side-by-side utility vehicle, which he hot-wired to start.  The next morning, Howell gave Thompson "strict instructions" to follow him while he drove the side-by-side to a store, turn off her phone, and then meet him later at a familiar spot in the woods.  Thompson did just that.

That same day, August 25, 2017, security cameras at a bank in Finger, Tennessee, recorded a lone man as he robbed the bank, while wearing full-body camouflage, a full-face camouflage ski mask, sunglasses, and black gloves.  The security video shows that the robber arrived at the bank in a side-by-side utility vehicle and parked close to the bank's entrance.  The bank manager, sixty-seven-year-old Dianne Talbott, and two tellers were working that day.  Shortly after 9:00 a.m., the robber entered the bank and walked to the teller's counter, where Talbott was standing.  He dropped some white garbage bags on the counter, pointed a handgun at Talbott, and demanded cash.  The two tellers quickly came to assist.  While waving his gun at the three employees and threatening to shoot them, the robber yelled at the tellers to get the

---

[1]The government submitted the video recordings to this court.

money from their cash drawers.  After the employees scrambled to put the cash in the bags, the robber demanded money from the vault and commanded Talbott to lie on the floor.  Referring to Talbott, the robber told the tellers that "if y'all don't hurry up, I'm fixing to kill this bitch."  They complied and the robber left the bank with about $43,274.00.  The robber was in the bank for a total of about seventy seconds.

Thompson testified that after she had waited in the woods near Finger for approximately thirty to forty-five minutes, Howell jumped in her Jeep wearing camouflage.  He threw a bag in the back, stashed a handgun under the Jeep's gearbox, and told Thompson to drive.  Howell changed his clothes and directed Thompson to a place in the woods, where Howell buried a bag.  Thompson then drove to a gas station where Howell disposed of the clothes he had worn.  The next stop was Howell's 10:00 a.m. court appearance.  Thompson later picked up Howell, and the two went to retrieve the bag Howell had buried.[2]

Later, Howell paid cash for a hotel room in Mississippi, where he told Thompson the details of the Finger bank robbery.  Howell said there were three women in the bank and mentioned that one was the mother of their high school teacher, John Talbott.  Howell recounted that he called Ms. Talbott "a stubborn bitch" because "she refused to give him the money," and "she fell on the floor" and screamed when "he threatened to shoot her."

Thompson noted that Howell had "money that he did not have before," which he kept inside a lockbox.  Despite being unemployed, after the robbery Howell paid off traffic tickets, paid a deposit and the first month of rent on a house, and quickly purchased a car, rims, tires for Thompson's Jeep, brake pads, a camera system, a stereo, a speaker, tennis shoes, glasses and contact lenses for Thompson, furniture, and methamphetamine—all of which Howell paid for with cash.

*The Reagan Bank Robbery*.  Thompson testified that soon Howell had spent all the money from the Finger robbery, so she and Howell began driving around West Tennessee to look for another bank to rob.  Howell eventually settled on a bank in Reagan, Tennessee.

---

[2]On that same day, an evidence technician with the FBI processed the stolen side-by-side, which had been found by law enforcement.  He took samples from the vehicle for DNA analysis, and the results showed "moderate support" that the samples included Howell's DNA.

On October 14, 2017, Thompson dropped Howell off near the target bank.  Thompson testified that Howell had a pistol and was wearing khaki pants, a Nike jacket that he had turned inside out, black gloves, shoe polish on his face, and a mask.

On the morning of October 14, 2017, security cameras at a bank in Reagan recorded a man as he attempted to rob the bank, while wearing khaki pants, a black jacket, black gloves, sunglasses, and a full-face camouflage ski mask.  The bank manager (Teresa Camper) and her co-worker had just walked into the enclosed teller area when the robber entered the bank and went to the locked door next to the teller's window and tried opening it.  The robber pointed his gun at the small window in the door as he peered through it at Camper and yelled twice "open the damn door."  Visibly frustrated, the robber ran to the teller's window and pointed his gun at one of the women.  He ran back to the door and looked through its window, before stepping back and firing a shot at the door window.  Camper and her co-worker got down on floor and crawled to the end of the bank as the robber fled.  The robber was in the bank for about thirty seconds.

Thompson told the jury that she picked Howell up, and he told her that the robbery "went bad" and that "he didn't get any money."  Howell also told Thompson he had "shot the gun at the glass, because they would not open the door."  They then traveled to Mississippi, where Thompson and Howell were arrested after a traffic stop on October 24, 2017.  In the vehicle, police found a loaded Springfield .45 caliber pistol, a Taurus 9mm caliber pistol, and a box of .45 caliber ammunition in a bag behind Howell's seat.  Law enforcement later recovered bullet fragments and an empty .45 caliber shell casing at the Reagan bank.  An analyst with the FBI compared the spent shell casing found at the Reagan bank with the .45 caliber pistol found in Howell's possession and opined that the cartridge was fired from the same pistol.[3]

---

[3]Federal agents also searched Thompson's Jeep and the car Howell had purchased after the Finger robbery. In the Jeep, agents located a jacket, a camouflage mask, receipts and papers, and a round of .45 caliber ammunition. In Howell's car, agents located a pair of black gloves, another camouflage mask, a green bag with a dollar sign on it, a hotel receipt, records, and a round of 9mm ammunition. An officer testified that the jacket, masks, and clothes were consistent with those worn during the robberies.

B.

In a four-count indictment filed on November 20, 2017, Howell was initially charged with: two counts of bank robbery (or attempted bank robbery), with a dangerous weapon, in violation of 18 U.S.C. § 2113(a) and (d) (Counts 1 and 3); brandishing a firearm during the Finger bank robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(i)-(ii) (Count 2); and discharging a firearm during the Reagan bank robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(i)-(iii) (Count 4). About sixteen months later, on April 1, 2019, the government filed a superseding indictment, adding Count 5 for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). After the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019), the government filed a second superseding indictment on September 16, 2019, which added a knowledge allegation to Howell's § 922(g) charge to comply with *Rehaif.*

Howell then simultaneously filed three motions in limine. First, under Federal Rules of Evidence 609 and 404, Howell moved to prohibit the government from impeaching him with unspecified prior convictions.[4] Second, Howell asked the district court to bifurcate Count 5 (felon in possession of a firearm) because allowing the jury to learn of his prior convictions for Count 5 would cause prejudice to him that would substantially outweigh the probative value for Counts 1, 2, 3, and 4. Third, Howell moved to exclude bank manager Dianne Talbott's testimony identifying Howell as the Finger bank robber, arguing it is improper lay witness testimony under Federal Rules of Evidence 701 and 403.

In a written pretrial order, the district court denied Howell's motion to exclude Talbott's identification testimony, concluding that "[h]er testimony is admissible." After the jury was selected, the court took up Howell's other two motions. The government informed the court that Howell stipulated to knowing he was a convicted felon for purposes of § 922(g) under Count 5, but the district court decided to take under advisement Howell's motion regarding his prior convictions because "it may depend on whether Mr. Howell testifies. And quite frankly if he does testify, what he testifies to." The court denied Howell's motion to bifurcate Count 5.

---

[4]The government, in its response to Howell's motion, identified Howell's 2016 felony conviction for aggravated assault and his 2004 misdemeanor conviction for theft.

After the government presented its case in chief, the jury was briefly excused. Howell acknowledged under oath that he understood his right to testify or not testify, stated that he did not wish to testify, and affirmed that he made the decision "freely and voluntarily." Howell presented no evidence. The jury found Howell guilty on all five counts and made special findings that Howell brandished a gun at the Finger bank robbery and discharged a gun at the Reagan bank robbery.

## C.

At sentencing, the district court (over Howell's objections) applied: (1) a two-level enhancement under USSG § 2B3.1(b)(4)(B), for "physically restrain[ing]" a person "to facilitate commission of the offense"; and (2) the cross-reference at USSG § 2K2.1(c)(1)(A), to then apply the higher offense level for attempted first-degree murder under § 2A2.1(a)(1). Consistent with Howell's presentence report (PSR), the district court determined that with Howell's total combined offense level of 34 and criminal history category of IV, the advisory Sentencing Guidelines yielded a range of 210 to 262 months of imprisonment for Counts 1, 3, and 5, followed by a consecutive 84 months of imprisonment on Count 2, and a consecutive 120 months of imprisonment on Count 4. The total sentencing range was 414 to 466 months. After considering the 18 U.S.C. § 3553(a) sentencing factors, the district court sentenced Howell to a total of 466 months of imprisonment, followed by 5 years of supervised release.

Howell timely appealed.

## II.

Howell assigns five errors to the district court: Three errors relate to his trial, and two errors concern the sentence the district court imposed. We consider each in turn.

## III.

## A.

Howell contends the district court interfered with his constitutional right to testify at trial because the court concluded that, unless and until Howell decided to testify, the court would not rule on Howell's motion in limine to prohibit the government from using his prior convictions to

impeach him under Federal Rules of Evidence 609(a)-(b) and 404. But that claim is unreviewable because Howell did not testify.

The Supreme Court's decision in *Luce v. United States*, 469 U.S. 38 (1984), is all but dispositive of the issue. There, the district court denied the defendant's motion in limine to preclude the government from using his prior controlled substance conviction to impeach him under Rule 609, and the defendant did not testify at trial. 469 U.S. at 39-40. The Court concluded that the district court's in limine ruling was unreviewable on appeal. *Id.* at 40-41. The Court held that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Id.* at 43. Thus, because Howell opted not to testify, he forfeited any challenge to the district court's ruling, including the decision to reserve its ruling. *See United States v. Gunter*, 551 F.3d 472, 483 (6th Cir.) (collecting cases), *cert. denied*, 558 U.S. 871 (2009); *United States v. Books*, 914 F.3d 574, 577, 579-80 (7th Cir.), *cert. denied*, 139 S. Ct. 2682 (2019).

Howell's rejoinder is that *Luce* does not control because this case involves the district court's refusal to issue a pre-testimonial ruling on his motion. Although it appears Howell is correct that this court has not addressed this precise situation, we see no reason why Howell's distinction makes any difference. The fact remains that "the [appellate] court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify." *Luce*, 469 U.S. at 41. Even a defendant's "proffer of testimony"— which Howell never offered—"is no answer" because the actual "trial testimony could . . . differ from the proffer." *Id.* at 41 n.5. If an appellate court cannot review an evidentiary ruling unless the defendant testifies, then it likewise cannot review the district court's decision to reserve its ruling on the issue when the defendant does not testify.

Nothing precludes a district judge from reserving an in limine ruling. The reality is that an in limine ruling is "not binding on the trial judge, and the judge may always change [their] mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000). That is true "even if nothing unexpected happens at trial." *Luce*, 469 U.S. at 41-42. Thus, the most Howell could have gained from the district court ruling on his motion was a tentative sense of protection on cross-examination—a fleeting benefit that could be revoked at any moment.

For that reason, reserving ruling on a pretrial motion until a defendant testifies does not affect the decision to testify any more than an adverse ruling. The defendant still "must decide whether or not to take the stand" and risk "impeachment by prior convictions"; and *if the defendant testifies*, the government still "must choose whether or not to impeach" the defendant with a prior conviction and "risk possible reversal on appeal from its use." *Ohler*, 529 U.S. at 757-58. It is not unconstitutional to "require the defendant to weigh such pros and cons in deciding whether to testify" under the "normal rules of trial." *Ohler*, 529 U.S. at 759-60 (citation omitted).[5]

Although the possibility of being "subject to impeachment by the use of a prior conviction" on cross-examination, in some sense, "may *deter* a defendant from taking the stand," that possibility does not amount to a constitutional violation because such circumstances do "not *prevent* [a defendant] from taking the stand." *Id*. at 759 (emphasis added); *cf. Nevada v. Jackson*, 569 U.S. 505, 509 (2013). Accordingly, the district court did not obstruct Howell from exercising his constitutional right to testify.

B.

Howell also challenges the denial of his motion in limine to exclude the identification testimony of Dianne Talbott, the Finger bank manager. He contends the testimony was improper lay opinion testimony under Federal Rule of Evidence 701. We review for abuse of discretion and will "reverse only where the district court's erroneous admission of evidence affects a substantial right of the party." *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007) (citing FED. R. EVID. 103(a)). No reversible error occurred here.

A fundamental rule of evidence is that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602. In conjunction with that principle, Rule 701 states that when "a witness is not testifying as an expert" under Rule 702, "testimony in the form of an opinion is limited" in that it must be: (1) "rationally based on the witness's perception"; (2) "helpful to

---

[5]"Only when the government exercises its option to elicit the testimony is an appellate court confronted with a case where, under the normal rules of trial, the defendant can claim the denial of a substantial right if in fact the district court's in limine ruling proved to be erroneous." *Ohler*, 529 U.S. at 759; *see Luce*, 469 U.S. at 41; FED. R. EVID. 103(a).

clearly understanding the witness's testimony or to determining a fact in issue"; and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. "The party offering the testimony under Rule 701"—in this case, the government —"must establish that all three requirements are satisfied." *United States v. Gyamfi*, 805 F.3d 668, 672 (6th Cir. 2015).

Howell does not challenge Talbott's first-hand account of the Finger bank robbery. Rather, he takes issue with Talbott's testimony identifying him as the Finger bank robber based upon what she learned after the robbery. In particular, Talbott testified on direct examination, "I could tell it was a man, but that was all. I was so frightened. You know, I wasn't even paying any attention to the voice really. But I knew it was a man." (PageID 672). Next, the following exchanged occurred.

> Q. Okay. You mentioned this man pointing the gun at you and threatening to kill you. Was he doing the same with the other ladies?
>
> A. Oh, he was, he was threatening all of us. But I'm not sure, but I think I'm the only one he threatened to kill.
>
> Q. What did you take from that?
>
> A. *Well, it just -- it felt like he knew me.* You know, not -- *of course, I didn't know who it was.* But I felt like *once they found out who robbed the bank, that I would know them.*
>
> Q. Okay. Was there a later occasion where you were with your husband and you came to a realization about who robbed you?
>
> A. Well, on the -- in October, I can't recall the date, it's 14th, 15th, something in there --
>
> Q. Talking about 2017?
>
> A. Yes. Yes. My husband and I were sitting on a Saturday morning eating breakfast and watching the news. . . . And the news come on about the bank in Reagan being robbed, or attempted robbery. And I looked, I looked at the film on TV, and I looked at my husband, I said, that is our bank robber right there. *Of course, I didn't know who it was, but I knew same MO, same everything.*
>
> Q. Okay. Now the defendant, Gene Howell, do you know him?
>
> A. I do.
>
> Q. Tell these folks how you know him?

A.    I know him through his deceased wife.

Q.    Okay. Had he come in your bank at one time?

A.    He had. He had.

Q.    How many times would you say he came in the bank?

A.    I'm not sure. I know *he may have come in with her once or so*. But after she passed he came in and asked me to open him an account up. . . . [A]s it turned out I couldn't help him. But before he left, I hugged him and wished him well, you know. Told him, you know, that I think about him, because they have two children.

Q.    Okay. Was this -- what would you say, months before or a couple of years before the robbery?

A.    It was just right after his wife passed.

Q.    Okay.

A.    I think she passed – I'm not sure what year she passed in. But it's been quite a bit before the bank robbery.**[6]**

Q.    All right. *Did you learn that the defendant had been arrested for the bank robberies*?

A.    *I did*.

Q.    Okay. Putting everything together --

A.    It made a lot of sense to me.

Q.    Okay.

A.    You know.

Q.    *Do you believe he's the one that robbed --*

A.    *I do. I do*.

(PageID 673-76 (emphasis added)).**[7]** On cross-examination, the speculative nature of Talbott's testimony was further revealed.

---

**[6]**According to the PSR, Howell's wife died about two years and ten months before the Finger bank robbery. (R. 163, ¶ 139.)

**[7]**Howell was not required to "make a contemporaneous objection" to Talbott's testimony because he raised the "evidentiary challenge in a motion in limine and the trial court ruled against [Howell] in an 'an explicit and definitive ruling' that [was] not 'conditioned upon any other circumstances or evidence.'" *United States v. Ford*, 761 F.3d 641, 653 (6th Cir. 2014) (quoting *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)); *see also* FED. R. EVID. 103(b); *United States v. Nixon*, 694 F.3d 623, 628 (6th Cir. 2012). In denying Howell's motion in limine, the district court acknowledged that Talbott's testimony at trial would include that: she could not identify the person who robbed the Finger bank when initially interviewed by police; "she was watching the news and, after

> Q. And, Ms. Talbott, were you able to identify the defendant when you were questioned by law enforcement when this robbery happened?
>
> A. *No*. It's like I told them, *I couldn't see anything. He had everything covered.* I was frightened. I just knew it was a male. But it felt really personal. It felt like he targeted me. And *I told them, I said, I don't know who that was.* But *when they catch him, I feel like I will know them.* I feel like they have been in this bank before.

(PageID 684-85 (emphasis added)).

Talbott's identification of Howell was not "rationally based on [her] perception[s]." FED. R. EVID. 701(a). "The function of lay opinion testimony is to 'describ[e] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) (quoting *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013)). "When a witness has not identified the objective bases for [their] opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find." *United States v. Hampton*, 718 F.3d 978, 981 (D.C. Cir. 2013) (brackets omitted) (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992)).

Here, Talbott did not identify Howell based on any objective perceptions from during the robbery or the one alleged occasion when she had encountered Howell nearly three years before the robbery. She did not offer any descriptive nexus between her alleged prior encounter with Howell and what she perceived about the robber, such as "size," "weight," "manner of conduct," or voice. *See* FED. R. EVID. 701 advisory committee's note to 2000 amendments (citation omitted). Talbott admitted she could not see the robber's identifying features. The bottom line is that Talbott "didn't know who [the robber] was" until she learned law enforcement had arrested Howell for the bank robberies. (PageID 673-76).

---

seeing the pictures of the [Reagan bank] robber, she told her husband that the robber in that incident was the same person that robbed her bank"; and "*once she learned that [Howell] had been arrested and charged with the two bank robberies*, she was certain that he was the person who robbed her bank in August because she knows him." (PageID 321 (emphasis added)). The district court definitively ruled that Talbott would "be allowed to testify as to why she believes [Howell] is the bank robber." *Id.*

Talbott's testimony was also not "helpful" to the jury. FED. R. EVID. 701(b). "[L]ay opinion identification testimony is helpful to the determination of whether a suspect depicted in a photograph is the defendant where there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *United States v. Dixon*, 413 F.3d 540, 545 (6th Cir. 2005) (cleaned up) (holding that identification testimony was properly excluded). Talbott's testimony that Howell was the Finger bank robber was based on putting together what she saw on the news about the Reagan bank robbery, the fact that the Finger and Reagan bank robbers had the "same MO," and that Howell had been arrested for the bank robberies. The jury can do that much. "It is not 'helpful' when a witness, lay or expert, forms conclusions for a jury that the jurors are competent to reach on their own." *Kilpatrick*, 798 F.3d at 380 (citing *Freeman*, 730 F.3d at 597).

"Nor is it helpful for a lay opinion witness to speculate or to repeat previously-admitted evidence that requires no explanation." *Id.* That is, "a lay witness may not explain to a jury what inferences to draw . . . because this crosses the line from evidence to argument." *Id.* at 381 (cleaned up) (quoting *Freeman*, 730 F.3d at 598); *see also United States v. Earls*, 704 F.3d 466, 472-73 (7th Cir. 2012) ("Rule 701 does not extend so far as to allow a witness to serve as the thirteenth juror and compare two pieces of evidence that are already available to the jury."); *United States v. Jett*, 908 F.3d 252, 271-72 (7th Cir. 2018) (case agent's lay testimony about changes in defendant's appearance between time search warrant was executed and time of trial was not helpful to jurors, who could observe surveillance footage of disguised bank robbers, because agent's testimony did not provide sufficient detail about length and manner of his interactions with defendant, which appeared to be "fleeting").

But reversal is not warranted because any error in allowing Talbott's testimony was harmless. *See United States v. Kettles*, 970 F.3d 637, 644-45 (6th Cir. 2020); FED. R. CRIM. P. 52(a); FED. R. EVID. 103(a). Under any harmless-error test for evidentiary errors, the error alleged here did not "affect the outcome," nor can we say that it "substantially swayed" the verdict. *See Kettles*, 970 F.3d at 644-45 (citations omitted); *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). This is because, even without Talbott's testimony, there was "overwhelming" evidence of Howell's guilt admitted at trial. *Kettles*, 970 F.3d at 645; *White*, 492 F.3d at 405.

In this case, the jury: heard Howell's accomplice, Thompson, testify that Howell admitted to committing the Finger bank robbery; heard her step-by-step account of Howell's actions before and after the robbery, including that Howell was wearing a camouflage mask and clothing and driving a side-by-side utility vehicle; saw that the bank's security videos corroborated Thompson's testimony; had receipts and heard testimony of Howell's exorbitant purchases immediately following the robbery, despite having no job; and had a report showing "moderate support" for Howell's DNA on samples taken from the side-by-side vehicle. Moreover, the district court specifically instructed the jury on Talbott's testimony and the various concerns surrounding identifications, such as visibility, the observational time frame, whether she had seen Howell before, and whether she initially failed to make an identification of Howell.

In these circumstances, any error in allowing Talbott's identification testimony was harmless.

## C.

Next, Howell argues that the district court erred in denying his motion in limine to sever the charge in Count 5, violation of 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm. Howell maintains this is so because the inclusion of Count 5 caused the jury to learn that he was a convicted felon and the government "vindictively added" Count 5 roughly sixteen months after filing the initial indictment. Both arguments are meritless.

### 1.

"We review the denial of a motion for severance under an abuse of discretion standard." *United States v. Tran*, 433 F.3d 472, 477 (6th Cir. 2006). Whether a joinder of charges in the indictment was appropriate "is determined by the allegations on the face of the indictment." *Thomas v. United States*, 849 F.3d 669, 675 (6th Cir. 2017). Joinder of offenses is permitted if the offenses are: (1) "of the same or similar character"; (2) "based on the same act or transaction"; or (3) "connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a). The second and third grounds for joinder embrace this case.

There is no doubt that the felon-in-possession charge, the armed robbery charges, and the § 924(c)(1)(A) charges for brandishing and discharging a gun are all intimately connected and essentially the "same act." As the indictment shows, the guns here were "tools" Howell used in committing the other offenses, making joinder appropriate. *See United States v. Chavis*, 296 F.3d 450, 459 (6th Cir. 2002). Federal Rule of Criminal Procedure 8(a) does not require exact parity. Indeed, we have held that joinder of a felon-in-possession charge and robbery charge was proper where the defendant purchased a shotgun "three days after the armed robbery and shooting," and the shotgun was purchased "with the proceeds of the armed robbery for the purpose of protecting property also bought with the same proceeds." *Thomas*, 849 F.3d at 675. Because the nexus is stronger here, joinder of Howell's felon-in-possession charge did not violate Rule 8(a).

Notwithstanding that joinder is proper, any prejudice to Howell would be harmless. FED. R. CRIM. P. 52(a); *see United States v. Locklear*, 631 F.3d 364, 369 (6th Cir. 2011). "An error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Lane*, 474 U.S. 438, 449 (1986) (quoting *Kotteakos*, 328 U.S. at 776); *see also* FED. R. CRIM. P. 14; *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993) (holding that a court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence"); *accord Tran*, 433 F.3d at 478.

"[T]he danger of prejudice resulting from improper propensity inferences can be reduced significantly," when, as in this case, the district court issues "proper curative instructions" for the jury to "consider separately . . . the evidence that relates to each charge." *See Chavis*, 296 F.3d at 461-62 (citing *Lane*, 474 U.S. at 450 n.13). Moreover, Howell's "stipulation of a prior felony minimizes the possibility of any prejudice based on the subject matter of the prior crime." *United States v. Atchley*, 474 F.3d 840, 853 (6th Cir. 2007). And the mere fact that the jury knew Howell was a felon did not have a "substantial" influence on the jury because, as explained, the evidence of Howell's guilt on the other charges was "overwhelming." *See Locklear*, 631 F.3d at 369; *Chavis*, 296 F.3d at 463.

2.

That leaves Howell's contention that the sixteen-month delay in joining Count 5 shows that it was "vindictively added." Howell admits the issue was not raised before the district court, so our review is under the plain-error standard. *United States v. Meda*, 812 F.3d 502, 510 (6th Cir. 2015). Howell has not satisfied that standard.

To prevail under plain-error review, Howell must "show (1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (citation omitted)); FED. R. CRIM. P. 52(b). Howell argues that the felon-in-possession offense in Count 5 triggered grouping, Count 5 was grouped with the armed robbery charge in Count 3, and the guideline for the felon-in-possession offense was used because it resulted in a greater offense level. While the government does not contest that the increased offense level affected Howell's substantial rights, *see United States v. Faulkner*, 926 F.3d 266, 275 (6th Cir. 2019), there was not an obvious error here.

"[S]o long as the prosecutor has probable cause . . ., the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). Although the Due Process Clause protects an individual from being "punished for exercising a protected statutory or constitutional right," *United States v. Goodwin*, 457 U.S. 368, 372 (1982), it is also true that "the Due Process Clause is not offended by all possibilities of increased punishment . . . but only by those that pose a realistic likelihood of 'vindictiveness.'" *Id.* at 384 (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). To that end, a vindictive prosecution challenge requires a defendant to show that: "'(1) the prosecutor has some stake in deterring the [defendant's] exercise of his rights and (2) the prosecutor's conduct was somehow unreasonable,' then the district court may find that there is a 'reasonable likelihood of vindictiveness' and may presume an improper vindictive motive." *United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013) (citation omitted). "The government bears the burden of rebutting the presumption with 'objective, on-the-record explanations' such as

'governmental discovery of previously unknown evidence' or 'previous legal impossibility.'" *Id.* (citation omitted).**[8]**

First, the presumption does not apply here because Howell has not shown how the prosecutor had any special stake in the proceeding. Between the time he was initially indicted and when Count 5 was added, Howell has not pointed to any pretrial rights he invoked or any motions that he filed that would reasonably provoke a vindictive response from the prosecutor. *See, e.g.*, *Goodwin*, 457 U.S. at 381; *LaDeau*, 734 F.3d at 568. Howell merely asserted his right to a jury trial by pleading not guilty on December 7, 2017—roughly fifteen months before Count 5 was added. But "[a] prosecutor has no 'personal stake' . . . and thus no reason to engage in 'self-vindication' upon a defendant's request for a jury trial." *Goodwin*, 457 U.S. at 383; *see Suarez*, 263 F.3d at 479. "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." *Goodwin*, 457 U.S. at 382. In short, the "initial decision should not freeze future conduct." *Id.*

Because Howell has relied "only on his interpretation of the sequence of events" that led to the addition of Count 5, "we are not at liberty to speculate about what drove the government" to do so, and we "cannot assume that the government intentionally withheld charges against [Howell] for improper purposes." *Meda*, 812 F.3d at 511.

To be sure, this case is far afield from *United States v. LaDeau*, 734 F.3d 561 (6th Cir. 2013). There, the defendant was charged with possessing child pornography and successfully litigated a motion to suppress "crucial evidence," "thereby eviscerat[ing] the government's possession case." *Id.* at 564, 569. The government obtained a superseding indictment five days before trial, adding the defendant's brother as a codefendant and charging both with conspiracy to receive child pornography—charges that added a five-year mandatory minimum sentence and doubled the maximum sentence the defendant was previously facing. *Id.* at 564-65. The district

---

**[8]**The government does not argue that it was "holding [the felon-in-possession charge] in abeyance as an inducement during plea bargaining." *United States v. Suarez*, 263 F.3d 468, 480 (6th Cir. 2001); *cf. LaDeau*, 734 F.3d at 569. Where that is the case, the result is straightforward: "[T]he prosecution may legitimately threaten to bring harsher charges in order to induce a defendant into pleading guilty, despite the fact that the harsher charges, if brought, might appear to penalize a defendant for exercising his right to trial." *LaDeau*, 734 F.3d at 569 (citing *Bordenkircher*, 434 U.S. at 363-65). Here, however, the government affirmatively avows "there was no threat in this case." (Appellee Br. 25).

court granted the defendant's motion to dismiss for prosecutorial vindictiveness after a hearing on the matter, and this court affirmed under an abuse-of-discretion standard. *Id.* at 565. We held that the prosecution had a stake in the defendant's right to file the suppression motion because it "forced the government to restart its prosecution from square one." *Id.* at 570. Nothing of that sort occurred here.

Second, Howell has not shown that the prosecutor acted unreasonably by adding the felon-in-possession charge. In contrast to *LaDeau*, the government did not change its theory, nor did Count 5 bring with it "longer mandatory minimums and maximums" than what was initially charged. *LaDeau*, 734 F.3d at 570. The maximum penalty for the felon-in-possession offense is ten years of imprisonment, whereas Counts 1 and 3 each carry a maximum of twenty-five years in prison, 18 U.S.C. § 2113(d), Count 2 carries a mandatory minimum of seven years and a maximum of life in prison, and Count 4 carries *a minimum of ten years* and a maximum of life in prison, 18 U.S.C. § 924(c)(1)(A)(ii)-(iii). Therefore, Howell has not shown a reasonable likelihood of vindictiveness.

But even if Howell was entitled to a presumption of vindictiveness (and he is not), the government has rebutted that presumption by showing that Count 5 was "not brought earlier because [it was] based on new evidence." *Suarez*, 263 F.3d at 480; *cf. LaDeau*, 734 F.3d at 566. The initial four-count indictment was filed on November 20, 2017. Defense counsel received a plea offer on June 13, 2018. The ballistics report was not prepared until September 6, 2018. About seven months later, on April 1, 2019, the government filed a superseding indictment, adding Count 5. The ballistics report was new and important evidence. In a charge for felon in possession of a firearm under § 922(g)(1), one element the government must prove is that "the firearm traveled in or affected interstate commerce." *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007). The government was not required to do so for Counts 1 through 4.

The ballistics report was important because it showed that the firearm found in Howell's possession when he was arrested in Mississippi on October 24, 2017, was the same firearm that discharged the spent .45 caliber shell casing at the Reagan, Tennessee, bank on October 14, 2017. While Howell counters that Thompson already told the FBI on November 6, 2017, that "she believed that one of the firearms located in the vehicle at the time of her arrest was the gun

utilized during the attempted bank robbery in Reagan, Tennessee," the government could not count on her cooperation because her change-of-plea hearing was continued twice before she finally pleaded guilty on October 18, 2019—long after the government added Count 5. Thus, the report was new evidence to support the charge in Count 5.

Accordingly, the denial of Howell's motion to bifurcate was not error.

IV.

Howell assigns two errors to the district court's calculation of his guidelines range: (1) a higher base offense level under USSG § 2A2.1(a)(1) for attempted first-degree murder, after applying the cross-reference at USSG § 2K2.1(c)(1)(A); and (2) a two-level enhancement under USSG § 2B3.1(b)(4)(B) for "physically restrain[ing]" a person during the offense. "The prosecution has the burden to prove by a preponderance of the evidence that [an] enhancement applies." *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013). When reviewing challenges to sentence enhancements, "we review the district court's factual findings for clear error and its legal conclusions *de novo.*" *United States v. Bailey*, 973 F.3d 548, 571 (6th Cir. 2020).

The evidence supports application of § 2A2.1(a)(1) and § 2B3.1(b)(4)(B).

A.

The district court did not erroneously use the cross-reference at § 2K2.1(c)(1)(A), to impose the base offense level of 33 under § 2A2.1(a)(1) for attempted first-degree murder. In contending otherwise, Howell argues that he was not charged or convicted of an "assault crime" or "attempted murder" and that the evidence is insufficient to find that he possessed the specific intent to kill any of the tellers during the Reagan bank robbery. Howell's arguments are unavailing.

Under the guideline for unlawful possession of a firearm, the cross-reference states that "[i]f the defendant used or possessed any firearm . . . in connection with the commission or attempted commission of another offense, . . . apply," as relevant here, "§ 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is

greater than that determined above." USSG § 2K2.1(c)(1)(A). Section 2X1.1, in turn, instructs courts to impose "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." USSG § 2X1.1(a). Howell used a firearm "in connection with . . . another offense," so the cross-reference applies.

Contrary to Howell's position, "another offense" is defined as "any federal, state, or local offense . . . *regardless of whether a criminal charge was brought, or a conviction obtained*." USSG § 2K2.1(c)(1)(A), comment., n.14(C) (emphasis added). "The § 2K2.1(c) cross-reference allows a district court to consider what the defendant's sentence would have been for crimes other than the firearm possession, and use the higher of the two offense levels to compute the sentence." *United States v. Smith*, 196 F.3d 676, 685 (6th Cir. 1990). And the district court is not limited to selecting only "offenses that were charged in the indictment or that resulted in a conviction." *United States v. Cowan*, 196 F.3d 646, 649 (6th Cir. 1999) (collecting cases); *see also United States v. Callahan*, 801 F.3d 606, 629 (6th Cir. 2014).

Here, the district court chose to use the attempted murder guideline, § 2A2.1, because it provides a higher offense level, and the court found that Howell possessed the specific intent to kill. The court set Howell's base offense at 33 under § 2A2.1(a)(1), which applies "if the object of the offense would have constituted first degree murder." USSG § 2A2.1(a)(1). "First degree murder," for purposes of the guideline, "means conduct that . . . would constitute first degree murder under 18 U.S.C. § 1111." USSG § 2A2.1, comment., n. 1. In pertinent part, that statute states:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by . . . willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, . . . robbery . . . is murder in the first degree.

18 U.S.C. § 1111(a).

"Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991) (quoting 4 C. Torcia, Wharton's Criminal Law § 743, at 572 (14th ed. 1981)). To apply

the attempted murder guideline, the district court must find that the defendant possessed the specific intent to kill, unless the facts presented "inevitably lead to [such] a finding." *United States v. Morgan*, 687 F.3d 688, 697 (6th Cir. 2012).

This court has concluded that "specific intent to kill could be inferred from a defendant firing a gun aimed at an individual." *United States v. Bradford*, 822 F. App'x 335, 339 (6th Cir. 2020) (citing *United States v. James*, 575 F. App'x 588, 596-97 (6th Cir. 2014)).

The district court made a finding of specific intent, and that conclusion is supported by the evidence. Camper testified: "I walked up to the window, and I was looking at it. And he was coming from -- he would go from the teller window over to where I was in the door." "I really got close because -- so I could see the mask. I could see his glasses. I could see the shape of his narrow face. I could tell it was narrow and long." Howell "was mad," "shaking" the door, and ordering Camper to "open the damn door." Camper stated that "at that time, he shot, he shot the gun. I didn't know whether it was going to come through that window." When asked if she was standing in front of the window when the gun was fired, she replied, "I don't know if I had moved my head back or not. But, yes, I was right there" in front of the door. (PageID 722-23). This paralleled the district court's recitation of the incident in applying § 2A2.1.

> In concluding that § 2A2.1 applied, the court reasoned:
>
> Now the thing that sways the Court as much as anything in this particular situation is where the bullet was shot. The bullet was shot into the glass, which, according to the exhibits that the government has attached to its memorandum, the glass is located higher up in the door and would be located in the vicinity very near where Ms. Camper was standing and where her face or her head or her upper body would have been located.
>
> . . . .
>
> . . . [W]hat the Court needs to look at in these situations is *whether the defendant possessed the specific intent to kill.* And based upon the location of the bullet, where it was discharged, and the way it was discharged, it appears to the Court that Mr. Howell was not trying to get the door open, *he certainly possessed the intent to kill Ms. Camper*, except for the fact that the bulletproof glass prevented the bullet from going through.

(Emphasis added).

The district court's finding is well-founded. We are not left with "the definite and firm conviction that a mistake has been committed." *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013) (quoting *United States v. Gardner*, 649 F.3d 437, 442 (6th Cir. 2011)). Yet Howell argues that finding attempted first-degree murder "requires impermissible speculation" because there is "inadequate information in the record as to the location of the bullet-resistant material, the exact position of [Camper] on the other side of the door, and the characteristics of the door." He insists on "crime scene sketches," "measurements," and more. But the burden is a preponderance of the evidence, not beyond all reasonable doubt. *Washington*, 715 F.3d at 984. Further, such evidence would not help Howell. "All courts are in agreement that what is usually referred to as 'factual impossibility' is no defense to a charge of attempt." *United States v. Williams*, 553 U.S. 285, 300 (2008) (quoting 2 W. LaFave, Substantive Criminal Law § 11.5(a)(2) (2d ed. 2003)). No error was made here.

B.

Howell's final challenge pertains to the two-level offense enhancement the district court imposed under USSG § 2B3.1(b)(4)(B) for Howell's conduct during the Reagan bank robbery. We reject his contention that a person was not "physically restrained" for purposes of § 2B3.1(b)(4)(B).

The robbery guideline provides that a two-level offense increase applies "if any person was physically restrained to facilitate commission of the offense or to facilitate escape." USSG § 2B3.1(b)(4)(B). Section 2B3.1 does not define "physically restrained." Under the commentary "background," it contains only a general statement: "The guideline provides an enhancement for robberies where a victim was forced to accompany the defendant to another location, or was physically restrained by being tied, bound, or locked up." *Id.*, comment., backg'd. Thus, we look to the definitions of "general applicability" under the guidelines. USSG § 1B1.1, comment., n.1. In turn, § 1B1.1 defines "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up." *Id.*, comment., n.1(L). Howell suggests this requires the use of "physical objects."

But in *United States v. Coleman*, we rejected the notion of a "'physical component' limitation as inapt." 664 F.3d 1047, 1050 (6th Cir. 2012). In that case, the defendant "pointed [his] pistol at [a bank employee] and ordered him to come out of his office and sit on the floor in the lobby." *Id.* at 1048, 1050. Because the defendant ordered the employee at gunpoint "to go to a different place and maintain position," we concluded that "this restraint on [the employee's] movement suffices for application of § 2B3.1(b)(4)(B)." *Id.* at 1050-51.

The same holds true here. The security video shows Talbott attempting to help gather the money before walking outside the camera frame. Talbott is not seen again because that is when Howell ordered Talbott at gunpoint to lie down on the floor. He shouted at the other tellers that "if y'all don't hurry up, I'm fixing to kill this bitch." The district court concluded this was sufficient under § 2B3.1(b)(4)(B). We agree. Howell prevented Talbott from continuing to move about by forcing Talbott to lie on the floor, and he used Talbott's life as leverage against her coworkers. In this way, Howell restrained Talbott "to facilitate commission of the offense or to facilitate escape." USSG § 2B3.1(b)(4)(B).

\*     \*     \*

The judgment of the district court is AFFIRMED.