RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee*,

    *v.*

DEVANTE GLENN,

                *Defendant-Appellant*.

> No. 23-3926

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:18-cr-00692-1—Solomon Oliver, Jr., District Judge.

Decided and Filed: July 28, 2025

Before: GILMAN, STRANCH, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Christian J. Grostic, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

GILMAN, J., delivered the opinion of the court in which STRANCH, J., concurred. LARSEN, J. (pp. 12–16), delivered a separate dissenting opinion.

───────────────

## OPINION

───────────────

RONALD LEE GILMAN, Circuit Judge. Devante Glenn, who was accused of selling drugs that led to an overdose death, appeals his conviction on two counts of distributing carfentanil, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and one count of using a telecommunications device to facilitate the transaction, in violation of 21 U.S.C. § 843(b).

Glenn contends that there was insufficient evidence to support his conviction and that the district court erred by allowing a law-enforcement officer, Agent Orlando Almonte, to testify as an expert about the meaning of common words and phrases contained in text messages sent between Glenn and the decedent. For the reasons set forth below, we **VACATE** Glenn's conviction and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual background

On July 19, 2017, Renee Ducatman died of a carfentanil overdose in her home in Solon, Ohio. Throughout June and July of 2017, Ducatman had six or seven conversations with multiple people whom she met through Backpage.com, an escorting-advertising site, seemingly about sex and illegal drugs.

On July 17, 2017, at 6:27 p.m., Ducatman called a 702 number and spoke for seven minutes. She then sent a number of texts to that number, saying: "Maake it happen," "Please dude," and "I have a hundred dollars." The 702 number responded with "U can't this phone like that. . . I'm about to give it back to him. . . I'm on it. I'll call you in a little bit." At trial, the government's expert witness, Ohio Bureau of Criminal Investigations Special Agent Almonte, testified that Ducatman was seeking drugs in those texts. Ducatman continued texting and calling the 702 number until 7:21 p.m. Her last text to the 702 number at 7:21 p.m. read: "Ok I guess, not you said you'd call me in thirty minutes its been an hour I got ready."

That same day, at 8:26 p.m., Ducatman called Glenn, whose number was saved in her phone as "Polo." They were on a series of brief phone calls over the course of an hour. During that time, Ducatman also called a 446 number three times. At 10:21 p.m., she called the 702 number again. Cell-tower data from the evening of July 17 through the early morning the next day indicated that Ducatman was not at home.

On July 18, Glenn called Ducatman around noon but did not get an answer. That night, Ducatman sent texts to various numbers, including a 785 number from a contact on Tinder. Glenn called Ducatman again at 10:45 p.m. but received no answer. Ducatman texted Glenn

about 10 minutes later, saying that she would call him back.  They exchanged texts and phone
calls, and cell-tower records showed that Glenn was traveling from the Cleveland area to Solon.
From 11:40 p.m. to 12:44 a.m., they sent the following texts:

| Ducatman | Ill make it worth it |
| Ducatman | I got you I know the game |
| Glenn | Ok |
| Ducatman | I'm excited |
| Glenn | Why u say dat |
| Ducatman | BC I'm,excited you're coming |
| Ducatman | Ill,make it worth it |
| Ducatman | You close |
| Glenn | U better naw on da eway.  I'm cumin baby |
| Ducatman | Dude I got you I know the game |
| Glenn | Ok ok |
| Glenn | It says ur 30 mins away |
| Ducatman | Okay I;m waiting |
| Ducatman | Tell me when you're close |
| Ducatman | Or call me |
| Ducatman | I'm ready |
| Glenn | Ima call u |
| Ducatman | Yay |
| Ducatman | Close I got dressed for you |
| Glenn | Ok an 15 |
| Ducatman | Ok |
| Ducatman | Ill meet you at Verizon |
| Ducatman | On the corner |
| Glenn | Yup |
| Glenn | Im bout to get off |
| Ducatman | Ok ill go verizon |
| Glenn | Ok |

At 12:46 a.m. on July 19, Glenn was on the phone with Ducatman for 3 minutes and 54 seconds. Cell-tower data showed that both Glenn and Ducatman were near the Verizon store in Solon next to Ducatman's home. Until 1:08 a.m. there was no activity from either Glenn's or Ducatman's phone. Cell-tower data showed that Glenn left the area near Ducatman's home between 1:08 a.m. and 1:20 a.m.

Between 1:15 a.m. and 1:28 a.m., Ducatman called Glenn six times. At 1:33 a.m., she texted Glenn: "I can't find it please come get me ill,literally do anything I'm dope sick bad." She called Glenn again at 1:35 a.m. and 1:43 a.m. Cell-tower data showed that Glenn turned back towards Ducatman's home around this time. At 1:53 a.m., Ducatman sent Glenn photos of an Hermès jewelry box and an iPad. They exchanged four more calls between 1:54 a.m. and 2:10 a.m., and cell-tower data showed that they were near her home from 2:00 a.m. to at least 2:11 a.m. before Glenn began driving back towards Cleveland. Ducatman's security system showed that she returned home at 2:15 a.m.

Ducatman called a friend for approximately five minutes at 2:18 a.m. An hour later, Glenn texted Ducatman, "U good," and then called her three times in a row. He continued to call her in the morning and early afternoon. Other friends, including "Randy" and "Cass," texted and called Ducatman during this same time period.

Shortly after 2:00 p.m. on July 19, Ducatman's mother found Ducatman unresponsive on the bathroom floor. The estimated time of death was approximately 2:30 a.m. on July 19. An autopsy confirmed that Ducatman died from intoxication caused by a combination of carfentanil, sertraline, and clonazepam. The government's forensic toxicologist testified that a urine test was positive for carfentanil, and that using carfentanil one to three days prior would yield a positive urine test, but that when a person dies from a carfentanil overdose, there would not be sufficient time for the drug to metabolize into urine. He also testified that carfentanil was the "but-for cause of [Ducatman's] death."

In May 2018, Detective Kristi Harvey interviewed Glenn. Detective Harvey did not tell Glenn why he was being questioned, and Glenn denied knowing Ducatman or being called "Polo." In that interview, he stated that he had not been to Solon the previous summer and that

he had not used the number linked to Polo's contact for a long time. But before trial, he stipulated that "Polo" was his nickname and that he had used the number linked to Polo's contact in July 2017. The officers interviewing him did not ask about drugs or mention that Ducatman had died. And Glenn asked whether Ducatman was claiming that he had raped her. The officers also showed him a picture of the Hermès box and iPad that Ducatman had texted to him, to which he responded by asking if he was being accused of robbing her.

**B.      Procedural history**

A grand jury indicted Glen on three counts: Two were for distributing carfentanil on July 19, 2017, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), with an enhancement on the second count for causing death. The third count was for the use of a communication facility to facilitate a felony drug offense, in violation of 21 U.S.C. § 843(b).

Trial began in April 2023. At trial, the government called Agent Almonte as an expert witness to present and interpret the text messages between Glenn and Ducatman. As to the conversation that occurred between 11:40 p.m. on July 18 and 12:44 a.m. on July 19, he asserted: "They are meeting for—in my opinion, they are meeting to conduct some type of exchange or some type of drug exchange." He concluded that Ducatman's text at 1:33 a.m. on July 19, referring to being "dope sick," meant "[s]omething was given to her, and she needs something else to help her with the fact that she is dope sick," and explained that "dope sick" referred to the withdrawal symptoms that begin to set in six to twelve hours after a dose of an addictive substance.

Agent Almonte also interpreted the series of text messages involving photos of the Hermès box and the iPad as follows: "[S]he is in a state where she is trying to barter with Polo by providing items of, material items such as the Hermès box, which I am assuming contains jewelry of some sort and an electronic tablet to barter for maybe another supply or a supply of drugs." At approximately 2:10 a.m., he believed that Glenn and Ducatman met for a short time where Glenn exchanged something for Ducatman's Hermès box and iPad. The government asked Agent Almonte if he had "any interpretation or opinion as to what the item was based on

the series of text messages." Over Glenn's objections, Agent Almonte testified that, in his opinion, Glenn gave Ducatman drugs.

At the end of Agent Almonte's direct testimony, the government again asked him what he believed had happened between Glenn and Ducatman. Glenn again objected, but the court overruled the objection. Agent Almonte then testified:

> I believe Renee was able to entice Mr. Polo to come to her the first time, whether it was an exchange for sex or any type of sex act for drugs. That occurred, and then once the meeting, I guess, was completed, she then, based on that one text, could not find what drugs were provided to her.
>
> And at that point, she then had to entice him out again to conduct another sale or exchange for drugs to which she used the jewelry and the tablet itself as a form of payment this time.

Agent Almonte did not elaborate on any methodology or special expertise on which his opinion was based.

At the close of the government's case in chief, Glenn moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court reserved a decision on the motion. After the close of all the evidence, Glenn renewed his motion, and the court again reserved a ruling.

The jury convicted Glenn of all charges. Both parties filed post-trial briefs on the motion for a judgment of acquittal, which the district court denied. In November 2023, the court sentenced Glenn to 240 months of imprisonment on Count 2 and 48 months of imprisonment on Counts 1 and 3, to be served concurrently. This timely appeal followed.

## II. ANALYSIS

### A. Standard of review

A district court's evidentiary decisions are generally reviewed under the abuse-of-discretion standard. *United States v. Matthews*, 31 F.4th 436, 452 (6th Cir. 2022). The government argues, however, that this issue should be reviewed under the plain-error standard because Glenn did not properly object at trial. The government notes that Glenn objected only twice: first, when the government asked Agent Almonte to opine on what Glenn had given

Ducatman in exchange for her Hermès box and iPad, and second when the government asked Agent Almonte summarize the interactions between Glenn and Ducatman over the course of the evening. Each time, Glenn's counsel simply stated "Objection, your honor" rather than providing an extensive explanation of the grounds for the objection. The government notes the evidentiary rule that an objection is not preserved for appellate review unless the objecting party "states the specific ground, unless it was apparent from the context." Fed. R. Evid. 103(a)(1)(B).

But Glenn's objections were clear from the context of the surrounding testimony because he objected to questions asking Agent Almonte to give his interpretation or opinion about what happened between Glenn and Ducatman based on Agent Almonte's review of the text messages, call logs, and cell-tower data. And the district court clearly understood the nature of the objections without further explanation, as evidenced by the court's response that "of course, as a person with background in this, [Agent Almonte] is allowed to testify, and he is allowed to talk about in his experience what normally, what drug dealers normally do." We will therefore review this issue under the abuse-of-discretion standard with regard to the two portions of the text messages that Glenn objected to Agent Almonte interpreting. *See Torres v. County of Oakland*, 758 F.2d 147, 149 n.1 (6th Cir. 1985) (holding that an objection to improper opinion testimony under the Federal Rules of Evidence was apparent from the context because the district court overruled the objection and allowed the witness to "state her opinion on that").

**B.     The court erred by allowing Agent Almonte to testify about the meaning of the text messages**

Under Rule 702 of the Federal Rules of Evidence,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The great bulk of the text messages between Glenn and Ducatman were not a proper subject for expert testimony, and Agent Almonte was not qualified to testify as an expert regarding those messages.

True enough, courts often permit officers to testify as expert witnesses under Rule 702 of the Federal Rules of Evidence to interpret conversations concerning drug trafficking that use "slang, street language, and the jargon of the illegal drug trade." *United States v. Young*, 847 F.3d 328, 350 (6th Cir. 2017); *see also United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015) ("Courts often qualify law enforcement officers as expert witnesses under Rule 702 to interpret intercepted conversations that use. . . the jargon of the illegal drug trade.") (internal quotation marks omitted)). Law-enforcement officers may give expert opinions about coded language or "common practices of the drug trade," provided that "the testimony is relevant and reliable." *United States v. Maya*, 966 F.3d 493, 505 (6th Cir. 2020).

Agent Almonte testified about his training and experience investigating drug trafficking, including reading text messages between drug traffickers and customers and listening to their calls. There were certainly aspects of his testimony, such as his interpretation of what "dope sickness" means, or his statement that drug users "have also bartered things as material items and/or sex" for drugs, that drew from his expertise.

But, apart from those narrow instances, the text messages between Glenn and Ducatman were nearly devoid of any such specialized language, and Agent Almonte did not lay a foundation for how his expertise would be helpful in interpreting common words and phrases in texts. He did not discuss any qualifications for interpreting common words and phrases that would assist the jury in distinguishing between people exchanging drugs and people discussing something other than drugs, such as sex or money. Accordingly, the jury was just as competent as Agent Almonte to interpret the common words and phrases used in these text messages. *See United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013) ("A witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own."). Agent Almonte's testimony involved interpreting ordinary English language to effectively tell the jury the government's theory of the case. In similar cases, we have vacated convictions where a law-

enforcement officer "effectively spoon-fed his interpretations of the [text messages] and the government's theory of the case to the jury, interpreting even ordinary English language." *Id.*

Evidentiary errors mandate reversal unless they are harmless. An error is harmless if the court has a "fair assurance" that the verdict was not "substantially swayed" by the error. *See United States v. Haywood*, 280 F.3d 715, 724 (6th Cir. 2002). The error here was not harmless. Ambiguous text messages between Glenn and Ducatman made up virtually all of the evidence that implicated Glenn in Ducatman's drug overdose. There was, for example, no eyewitness identification or search-warrant evidence that connected Glenn to the drug transaction in question. Agent Almonte instead testified about the meaning of the text messages with an "aura of expertise and authority." *See Freeman*, 730 F.3d at 599 ("An agent presented to a jury with an aura of expertise and authority increases the risk that the jury will be swayed improperly by the agent's testimony, rather than rely on its own interpretation of the evidence."). The jury, therefore, might well have been "substantially swayed" by his testimony. *See Haywood*, 280 F.3d at 724.

But the government argues that there was an abundance of other testimony, including the strength of the text messages, phone-location information, and uncontested autopsy and forensic evidence. We have already noted, however, that these text messages were ambiguous, and although the other evidence demonstrated that Glenn was in the same vicinity as Ducatman on the night before her death and that Ducatman died from a carfentanil overdose, it did not conclusively establish that Glenn gave Ducatman the carfentanil that she eventually overdosed on.

Similarly, the dissent opines that the contested testimony is merely cumulative of Agent Almonte's other testimony. Dissent at 14–15. But most of the statements that the dissent points to are more general statements regarding drug users, including several explaining Ducatman's dope sickness. Only three of the statements that the dissent cites are arguably cumulative. The first is Agent Almonte's opinion that the meeting appeared "to conduct some type of exchange or some type of drug exchange." Second is the reference to the jewelry-box and iPad photos as instances where Glenn and Ducatman are discussing "maybe another supply or a supply of drugs." And the third is one that an "exchange for the[] items . . . occurred." The third

statement, however, comes from Agent Almonte's testimony that "[t]he individual by the name of Polo met with this [Ducatman] for a short period of time, short term and whatever they did, whether it was an exchange for these items that occurred and completed."

All three of these statements are far more speculative and are not stated with the same "aura of expertise and authority" as those objected to by Glenn. *See Freeman*, 730 F.3d at 599. In sum, the contested statements were not merely cumulative.

The government further argues that there was a lack of evidence pointing to any other drug source, but there were multiple texts and phone calls in the record between Ducatman and other numbers that seemingly reference drug use. In any event, the government is the party with the burden to prove that Glenn provided the drugs, not Glenn's burden to prove otherwise. And the verdict appears to have been much closer than the government and the dissent suggest, as demonstrated by the almost full day of jury deliberations and a note from the jury to the court at one point saying that they "are deadlocked." Because so much of the case revolves around Agent Almonte's testimony and the text messages in question, we do not have a "fair assurance" that the verdict was unaffected by Agent Almonte's improper testimony. *Id.*

## C.    Sufficiency of the evidence

Agent Almonte's improper expert testimony requires a new trial, but the Double Jeopardy Clause prohibits the government from retrying Glenn if it did not present sufficient evidence to get a conviction at the first trial. *See United States v. Miller*, 767 F.3d 585, 601 (6th Cir. 2014). "The question is whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We must therefore consider whether the evidence against Glenn, including the erroneous evidence, was sufficient. *See Lockhart v. Nelson*, 488 U.S. 33, 40 (1988).

Viewing the evidence in the light most favorable to the prosecution, including Agent Almonte's improper testimony, we conclude that the government presented sufficient evidence to support each of the charges against Glenn. The government presented evidence that Glenn

and Ducatman met the night of her death.  Through texts and cell-phone data, it showed that the two met for roughly 20 minutes, and that shortly after he left, Ducatman texted him:  "I can't find it please come get me ill,literally do anything I'm dope sick bad."  She then texted a picture of the Hermès box and iPad, and a reasonable jury could make the inference that Ducatman was attempting to lure Glenn back to her home with those items.  The government also presented evidence that Glenn then returned to the area around Ducatman's home, and that she died 20 minutes later.  Finally, the government presented Agent Almonte's testimony interpreting the texts as a deal to exchange drugs.

A rational trier of fact could thus find beyond a reasonable doubt that Glenn knowingly or intentionally distributed a controlled substance that caused Ducatman's death, *see* 21 U.S.C. § 841(a)(1), (b)(1)(C), and that he knowingly or intentionally used a communication facility to facilitate the distribution, *see* 21 U.S.C. § 843(b).  In sum, the evidence that includes Agent Almonte's testimony is sufficient to convict Glenn, but is not so overwhelming as to make the admission of the improper testimony harmless.  We therefore find no Double Jeopardy bar if the government elects on remand to retry Glenn.

**III.  CONCLUSION**

For all the reasons set forth above, we **VACATE** Glenn's conviction and **REMAND** for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

LARSEN, Circuit Judge, dissenting. The majority opinion concludes that two inadmissible statements by Agent Almonte, which largely overlapped with his uncontested testimony, could have swayed the jury's verdict. I believe the record shows otherwise. Accordingly, I respectfully dissent.

To be clear, Glenn contests only two statements by Agent Almonte—the two he objected to below. His appeal objects to no other parts of Almonte's testimony. The only two contested statements are: "I would say an exchange did occur between Polo and Renee for these items for drugs," and

> I believe Renee was able to entice Mr. Polo to come to her the first time, whether it was an exchange for sex or any type of sex act for drugs. That occurred, and then once the meeting, I guess, was completed, she then, based on that one text, could not find what drugs were provided to her.

> And at that point, she then had to entice him out again to conduct another sale or exchange for drugs to which she used the jewelry and the tablet itself as a form of payment this time.

R. 183, Trial Tr., PageID 2224, 2227. The majority opinion concludes that these two challenged statements (1) violated Federal Rule of Evidence 702 and (2) substantially swayed the jury's verdict. Even if the majority is correct on the first point, I disagree on the second. Because the government provided compelling evidence of Glenn's guilt, and Almonte's challenged statements were largely cumulative of his unchallenged testimony, I have fair assurance that these two opinions did not "substantially sway[]" the jury's verdict. *United States v. Kettles*, 970 F.3d 637, 643 (6th Cir. 2020) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

The government presented the following substantial evidence of Glenn's guilt: Ducatman and Glenn planned to meet the night of July 18. Cell phone data shows that they were in the same location between roughly 12:46 AM and 1:08 AM on July 19. Following the apparent meeting, Glenn traveled north toward Cleveland, where he lived. As he was heading north, Ducatman repeatedly called him. She then texted him saying, "I can't find it

please come get me ill,literally do anything I'm dope sick bad."  R. 186-12, Gov. Trial Ex., PageID 2579.  Glenn picked up her next call.  When she called once again after that, Glenn answered and proceeded to turn back toward Solon, where Ducatman lived.  Right after the call ended, Ducatman sent him photos of a jewelry box and an iPad.  Glenn arrived back in Solon, and his and Ducatman's cell phones were in the same vicinity for a couple of minutes.  Glenn then headed north again, and Ducatman promptly returned home.  Approximately twenty minutes later, Ducatman died of a drug overdose.

Events following Ducatman's death further conveyed Glenn's guilt.  Glenn texted Ducatman, "U good," at 3:14 AM on July 19 (an hour after his final meeting with her) and called her nine times throughout the day.  *Id.*  When Solon Police Detective Kristi Harvey finally answered Ducatman's phone, Glenn didn't ask for Ducatman or inquire about her.  Instead, he hung up and stopped calling.  Ducatman's mother, meanwhile, never found the jewelry box or iPad captured in the photos.  And investigators never discovered leftover drugs in Ducatman's home.  Lastly, when Detective Harvey interviewed Glenn, he told multiple lies—denying that he went by the name "Polo," that he had ever seen Ducatman, and that he had been to Solon that summer.  *See United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995) (remarking that the defendant's "affirmative attempts to disassociate" himself from contraband "showed consciousness of guilt").

The lack of other suspects bolstered the case against Glenn.  Though the majority opinion observes that Ducatman had multiple texts referencing drug use on her phone, those texts did not occur the night she died—when she was "dope sick bad" and would "literally do anything." R. 186-12, Gov. Trial Ex., PageID 2579.  Rather, Ducatman's communications with others the night of her death were unremarkable.  She and a "785" number, for example, talked about what they were up to, what restaurants they liked, and what they sought from the dating app Tinder.  Meanwhile, Ducatman told "Randy" that she was depressed and didn't want to go out.  She also spoke with "Cass" on the phone a few times, including right before she died, and their conversations appeared to be about dates Cass had been on and plans for Cass's upcoming visit.  When all three individuals attempted to communicate with Ducatman the next day, their messages were nothing like Glenn's repeated phone calls.  The 785 number

texted: "Hope you're having a nice day." R. 187-2, Def. Trial Ex., PageID 2857. Randy messaged: "Hiii!" *Id.* And Cass sent texts like: "Where are you?"; "Please pick up I'll cry"; "I just want to hug you I've been through hell and back please text me." *Id.* at 2857–58.

This evidence strongly indicates that Glenn sold Ducatman drugs in exchange for the jewelry box and iPad and that the drugs killed her. Though the government may have erred in using Almonte to "spoon-fe[e]d" its case theory to the jury, these incriminating facts readily lend themselves to the same conclusion. *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013).

Other portions of Almonte's testimony provide further assurance that any error in allowing the two challenged statements was harmless. As noted above, Glenn doesn't object to the bulk of Almonte's testimony, most of which was incriminating and largely overlapped with his two contested opinions. For example, Glenn does not object to Almonte's testimony in which he:

- Shared that "dope sickness" occurs when a narcotics addict lacks access to drugs and feels physically ill, depressed, and as if "they just can't live without the drug itself";

- Stated that drug users sometimes barter "material items and/or sex" to pay for drugs;

- Opined on what Ducatman and Glenn's first meeting appeared to be for—"to conduct some type of exchange or some type of drug exchange";

- Interpreted Ducatman's message saying she was "dope sick" and would "literally do anything" to mean that "[s]omething was given to her, and she needs something else to help her with the fact that she is dope sick";

- Stated that Ducatman's earlier messages to friends about feeling sick and depressed aligned with dope sickness symptoms;

- Interpreted the jewelry box and iPad photos Ducatman sent Glenn to mean that she was bartering with Glenn in exchange for "maybe another supply or a supply of drugs";

- Expressed his belief that, based on the brief encounter between Ducatman and Glenn at 2:10 AM, it appeared that an "exchange for the[] items . . . occurred"; and

- Opined that Glenn's message to Ducatman at 3:14 AM—"U good"—was Glenn checking in on her because "[n]ow that she has dope, she feels better or okay, and it is over an hour [since] she used it."

R. 183, Trial Tr., PageID 2212, 2218, 2220–24. Uncontested, then, is Almonte's opinion that Ducatman was suffering from drug withdrawals and his three suggestions that Ducatman and Glenn had met for a drug deal. In light of this uncontested evidence, along with the evidence recounted earlier, Almonte's two challenged opinions did not have any significant effect on the jury's verdict. *See United States v. Rios*, 830 F.3d 403, 416–17 (6th Cir. 2016) (concluding error was harmless because the testimony was cumulative of other testimony).

The majority opinion disagrees. It starts by explaining that "[t]he ambiguous text messages" between Ducatman and Glenn "made up virtually all of the evidence" against Glenn. Maj. Op. at 9. True, the messages made up a large part of the case against Glenn. But they hardly made up all the evidence against him. Plenty of circumstantial evidence did as well.

Nor are the text messages that ambiguous—at least not the most incriminating one: "I can't find it please come get me ill,literally do anything I'm dope sick bad." R. 187-1, Trial Tr., PageID 2676. Clearly, Ducatman had lost something—"it." Clearly, she was suffering from drug withdrawals. And clearly, she was desperate for Glenn to return. To be sure, if one reads the message in a vacuum, "it" and "anything" may seem ambiguous. That ambiguity slips away, however, if one reads the message in context: after Ducatman sent the text, Glenn returned to Solon, where he and Ducatman briefly met up; Ducatman apparently gave Glenn valuable items; Ducatman died of a carfentanil overdose shortly thereafter; Glenn, concerned about whether Ducatman was "good," repeatedly tried to contact her the next day; and investigators never found any leftover drugs in Ducatman's home.

Rather than placing the messages in context, the majority opinion silos them. This enables the majority to deem the messages ambiguous and to minimize the import of the circumstantial evidence. But the jury learned of the messages in conjunction with the other evidence, and we must consider them in that light too. *See United States v. Campbell*, 122 F.4th 624, 632–33 (6th Cir. 2024) ("[H]armless error review is based on an assessment of all 'relevant and reliable information' in the 'entire record' . . . ." (quoting *Greer v. United States*, 593 U.S.

503, 511 (2021))).  When we do, the meaning of the messages and the significance of the circumstantial evidence come into focus.  *See supra* at 12–14.

Finally, the majority opinion is concerned that the "aura of expertise and authority" accompanying Agent Almonte's testimony unduly influenced the jury.  Maj. Op. at 9 (quoting *Freeman*, 730 F.3d at 599).  Yet any improper influence that Almonte's two contested opinions might have had was minor.  As outlined above, the texts, cell locations, and timeline alone were highly incriminating, and the opinions largely overlapped with Almonte's uncontested testimony.  To reiterate, the jury heard from Almonte, in unchallenged testimony, that Ducatman and Glenn's first meeting appeared to be "some type of exchange or *some type of drug exchange*"; that Ducatman was bartering with Glenn for "maybe another supply or *a supply of drugs*"; and that, around 3 AM on July 19, Ducatman "*has dope*, she feels better or okay, and it is over an hour [since] *she used it*."  R. 183, Trial Tr., PageID 2218, 2222, 2224 (emphasis added).  Moreover, the threat of improper influence is more acute when the agent worked on the case and testifies as both an expert *and* a lay witness, because "the jury [may] suspect[] that he has investigative information they do not."  *Freeman*, 730 F.3d at 599.  Almonte did not work on Glenn's case and testified solely as an expert, thereby mitigating any such threat here.  Lastly, the district court instructed the jury that Almonte "testified as an opinion witness" and that it "d[id] not have to accept his opinion."  R. 184, Trial Tr., PageID 2467.  So the jurors were on notice not to defer to Almonte's beliefs.  *See Samia v. United States*, 599 U.S. 635, 646 (2023) (observing that the law "assum[es] that jurors can be relied upon to follow the trial judge's instructions").

\* \* \*

For the foregoing reasons, the two challenged opinions offered by Agent Almonte did not have a marked impact on the jury's verdict.  I therefore would affirm Glenn's convictions.  I respectfully dissent.